PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NORMAN OTTMANN,
                    *Plaintiff-Appellant,*

v.

HANGER ORTHOPEDIC GROUP,
INCORPORATED; IVAN R. SABEL;
RICHARD A. STEIN,
                    *Defendants-Appellees,*

v.

DAVID CHOPKO; GARY BACKOUS,
                    *Movant-Appellants.*

No. 02-2283

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CA-00-3508-AW)

Argued: September 25, 2003

Decided: December 22, 2003

Before WILKINS, Chief Judge, and WIDENER
and LUTTIG, Circuit Judges.

---

Affirmed by published opinion. Chief Judge Wilkins wrote the opinion, in which Judge Widener and Judge Luttig joined.

---

## COUNSEL

**ARGUED:** Andrew M. Schatz, SCHATZ & NOBEL, P.C., Hartford, Connecticut, for Appellants. Glenn M. Kurtz, WHITE & CASE, New

York, New York, for Appellees. **ON BRIEF:** Jeffrey S. Nobel, SCHATZ & NOBEL, P.C., Hartford, Connecticut; Charles Juster Piven, LAW OFFICE OF CHARLES J. PIVEN, Baltimore, Maryland, for Appellants.

---

## OPINION

WILKINS, Chief Judge:

Norman Ottmann, David Chopko, and Gary Backous (collectively, "Appellants") appeal a district court order dismissing their securities fraud suit against Hanger Orthopedic Group, Inc. (Hanger) and two of its senior officers, Ivan R. Sabel and Richard A. Stein,[1] pursuant to Federal Rule of Civil Procedure 12(b)(6) and provisions of the Private Securities Litigation Reform Act of 1995 (PSLRA), *see* 15 U.S.C.A. § 78u-4(b)(1), (2) (West 1997). Finding no reversible error, we affirm.

I.

Hanger provides services to patients who require orthotic and prosthetic devices, such as artificial limbs. On July 1, 1999, Hanger acquired NovaCare Orthotics & Prosthetics (NovaCare), another provider of orthotic and prosthetic devices. Through this acquisition, Hanger acquired 369 patient care facilities operated by NovaCare, and it hired former NovaCare personnel, including certified practitioners qualified to fit orthotic and prosthetic devices. The NovaCare acquisition more than doubled the size of Hanger's United States operations, bringing Hanger's total number of patient care facilities to 636, with a total of 920 certified practitioners in 42 states and the District of Columbia.

On November 8, 1999, Hanger issued a press release reporting financial results for the third quarter of 1999, which had ended on September 30. This was the first quarter in which Hanger's financial results included the results of the new NovaCare division. The

---

[1]We refer to Hanger, Sabel, and Stein collectively as "Appellees."

November 8 press release reported third quarter revenue of $124.9 million and net income of $5.81 million, or $0.24 per share.

Also on November 8, Sabel, Stein, and another Hanger officer held a conference call with securities analysts and investors ("the November 8 call"). During this call, the officers reiterated the financial results set forth in the press release and discussed in detail the integration of NovaCare into Hanger. While the officers made mostly positive comments regarding the integration, they explained that revenue had been reduced by the departure of some former NovaCare practitioners in connection with the acquisition.

On January 6, 2000, Appellees announced in another press release that they expected revenue and earnings for the fourth quarter of 1999 and the year 2000 to fall substantially below analysts' expectations, with estimated fourth quarter revenue of $115 million and a break-even in earnings per share. The next morning, Sabel and Stein participated in another conference call with analysts and investors to discuss these results ("the January 7 call"). During this call, Stein explained that Hanger's disappointing results were attributable to three factors: (1) additional losses of former NovaCare practitioners, (2) a decision to conform the revenue recognition practices of the NovaCare division to Hanger's practices, and (3) a reduction in referral business from rehabilitation clinics due to the NovaCare acquisition. That same day (the first trading day after Hanger's negative financial news was released), the price of Hanger common stock dropped from the previous day's closing price of $9.375 per share to as low as $3.75—a decline of 60 percent—before closing at $4.8125.

Appellants subsequently brought this proposed class action on behalf of investors who purchased Hanger stock between November 8, 1999 and January 6, 2000. Appellants claimed that Appellees made a series of oral and written misrepresentations and omissions of fact in violation of section 10(b) of the Securities Exchange Act of 1934, *see* 15 U.S.C.A. § 78j(b) (West Supp. 2003), and Rule 10b-5, *see* 17 C.F.R. § 240.10b-5 (2003).[2] Appellants later amended their complaint.

---

[2]Appellants also asserted a claim against Sabel and Stein as "controlling person[s]," *see* 15 U.S.C.A. § 78t(a) (West 1997). This claim

Appellees moved to dismiss, arguing that Appellants had failed to plead with particularity any false or misleading statements by Appellees, the materiality of such statements, or scienter. The district court agreed and dismissed the amended complaint. The court expressed "serious doubts as to whether [Appellants would] be able to meet the threshold requirements for pleading with particularity in a securities class action suit," J.A. 41, but nevertheless granted Appellants an opportunity to amend their complaint. Further, the district court gave Appellants specific guidance regarding how to redraft their complaint.

Appellants subsequently filed a second amended complaint, and Appellees again moved to dismiss based on essentially the same grounds asserted in their earlier motion. Emphasizing that it had previously given Appellants an opportunity to plead their claims with greater particularity, the district court determined that Appellants' new complaint contained the same defects as the earlier one. Thus, based on its conclusion that Appellants had "not met the threshold requirements for pleading with particularity in a securities class action suit," *id.* at 332, the district court dismissed the complaint with prejudice.

## II.

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege that "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999) (internal quotation marks omitted). At issue here is whether Appellants adequately pleaded the first two elements. We review the dismissal of a complaint pursuant to Rule 12(b)(6) de novo. *See Baird ex rel. Baird v. Rose*, 192 F.3d 462, 467 (4th Cir. 1999).

---

requires an underlying violation of the securities fraud laws. *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 686 (4th Cir. 1999). Based on our conclusion below that Appellants have not adequately pleaded their claim under § 10(b) and Rule 10b-5, we also conclude that the district court properly dismissed the "controlling persons" claim.

### A. *Standards for Material Misrepresentation or Omission*

To allege a false statement or omission of material fact, a plaintiff "must point to a *factual* statement or omission—that is, one that is demonstrable as being true or false." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999). Additionally, the plaintiff must allege that the statement is false or that the omitted fact renders a public statement misleading. *See id.* And, "any statement or omission of fact must be *material*," *i.e.*, there must be "a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Id.* at 682-83. Under the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C.A. § 78u-4(b)(1).

### B. *Standards for Scienter*

#### 1. *Substantive Standard*

In a securities fraud action, "the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976); *see Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir. 1994). Mere negligence will not suffice. *See Phillips*, 190 F.3d at 621. Additionally, every circuit that has considered the issue has held that scienter may also be established by a showing of recklessness.[3] *See Hudson v. Phillips*

---

[3]Following the enactment of the PSLRA (which, as explained below, heightened pleading requirements in securities fraud actions), questions arose concerning the validity of pre-PSLRA decisions holding that scienter could be established by a showing of recklessness. *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 407 (5th Cir. 2001). We have concluded, however, that the PSLRA did not alter the substantive standard for proving scienter in securities fraud actions. *See Phillips*, 190 F.3d at 620; *see also, e.g.*, *Nathenson*, 267 F.3d at 407-08 (reaching same conclusion). *But cf. Janas v. McCracken* (*In re Silicon Graphics Inc. Sec. Litig.*), 183 F.3d 970, 974 (9th Cir. 1999) (apparently concluding that PSLRA raised scienter standard to "deliberate recklessness," requiring plaintiffs to "state facts that come closer to demonstrating intent").

*Petroleum Co.* (*In re Phillips Petroleum Sec. Litig.*), 881 F.2d 1236, 1244 (3d Cir. 1989); *Van Dyke v. Coburn Enters.*, 873 F.2d 1094, 1100 (8th Cir. 1989); *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989); *Hackbart v. Holmes*, 675 F.2d 1114, 1117-18 (10th Cir. 1982); *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. Apr. 1981) (en banc); *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1023-25 (6th Cir. 1979); *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044-45 (7th Cir. 1977); *cf. Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 (2d Cir. 1978) (concluding that scienter may be established by recklessness "in appropriate circumstances"). However, neither this circuit nor the Supreme Court has addressed this particular question. *See Ernst & Ernst*, 425 U.S. at 194 n.12; *Phillips*, 190 F.3d at 620 (noting that scienter "may *perhaps* be shown by recklessness" (emphasis added)).

In *Phillips*, we defined "recklessness" as "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Phillips*, 190 F.3d at 621 (internal quotation marks omitted); *see, e.g.*, *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001) (articulating same definition of recklessness); *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (same); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999) (same). Such "severe recklessness" is, in essence, "a slightly lesser species of intentional misconduct." *Nathenson*, 267 F.3d at 408 (internal quotation marks omitted). This definition of recklessness comports with the observation of the Supreme Court that "[t]he words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional misconduct." *Ernst & Ernst*, 425 U.S. at 197. We therefore agree with our sister circuits that a securities fraud plaintiff may allege scienter by pleading not only intentional misconduct, but also recklessness.

## 2. *Pleading Standard*

With this substantive standard in mind, we turn to the requirements for pleading scienter in securities fraud cases. The PSLRA requires that "the complaint shall, with respect to each act or omission alleged

to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.A. § 78u-4(b)(2). Congress enacted this more stringent pleading standard "to curtail the filing of meritless lawsuits" and to create a uniform pleading standard among the circuits. H.R. Conf. Rep. No. 104-369, at 41 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 740.

The PSLRA thus "seek[s] to heighten the standard for pleading scienter, and so changes what a plaintiff must plead in his complaint in order to survive a motion to dismiss."[4] *Phillips*, 190 F.3d at 620 (internal quotation marks & alteration omitted); *see id.* (noting that the PSLRA "indisputably seeks to make pleading scienter more difficult for plaintiffs"). Other circuits have reached differing conclusions regarding the proper interpretation of the requirements for pleading scienter under the PSLRA. However, we have "not yet determined which pleading standard best effectuates Congress's intent." *Id.* at 621.

Prior to the enactment of the PSLRA, the Second Circuit required securities fraud plaintiffs "to allege facts that give rise to a strong inference" of scienter. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). A "strong inference" could be demonstrated "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

In enacting the PSLRA, Congress adopted the "strong inference" language used by the Second Circuit, which it regarded as the most stringent pleading standard in the country. *See* S. Rep. No. 104-98, at 15 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 694. However, it is not clear whether Congress also intended to adopt the Second Circuit rule permitting plaintiffs to show a strong inference by alleging facts

---

[4]The heightened pleading requirements of the PSLRA supersede the requirements of Federal Rule of Civil Procedure 9(b) in securities fraud cases, at least with respect to scienter. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1034 n.12 (9th Cir. 2002); *Advanta Corp.*, 180 F.3d at 531 n.5.

demonstrating motive and opportunity. Following enactment of the PSLRA, the Second Circuit reaffirmed its pre-PSLRA standard. *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 537-38 (2d Cir. 1999) (stating that the PSLRA "heightened the requirement for pleading scienter to the level used by the Second Circuit"). And, the Third Circuit has held that the pleading standard of the PSLRA is essentially that of the Second Circuit. *See Advanta Corp.*, 180 F.3d at 533-34. The Ninth Circuit, however, has concluded that Congress rejected the Second Circuit "motive and opportunity" standard and therefore that facts showing motive and opportunity cannot alone establish a strong inference of scienter. *See Janas v. McCracken* (*In re Silicon Graphics Inc. Sec. Litig.*), 183 F.3d 970, 977-79 (9th Cir. 1999). Similarly, the Eleventh Circuit has held that the PSLRA did not codify the "motive and opportunity" standard, and thus, allegations of motive and opportunity, without more, are insufficient to plead scienter. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1285-86 (11th Cir. 1999).

However, a number of other circuits have concluded that, in enacting the PSLRA, Congress chose neither to adopt nor reject particular methods of pleading scienter—such as alleging facts showing motive and opportunity—but instead only required plaintiffs to plead facts that together establish a strong inference of scienter. *See Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 659-60 (8th Cir. 2001); *Nathenson*, 267 F.3d at 411-12; *Fleming Cos.*, 264 F.3d at 1261-63; *Helwig v. Vencor, Inc.*, 251 F.3d 540, 550-52 (6th Cir. 2001) (en banc); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 195-96 (1st Cir. 1999). In addition to noting the absence of any language in the PSLRA addressing particular methods of pleading, some of these courts have observed that the legislative history regarding whether Congress intended to adopt or reject the "motive and opportunity" standard is conflicting and inconclusive. *See Green Tree Fin. Corp.*, 270 F.3d at 657-58; *Nathenson*, 267 F.3d at 411; *Greebel*, 194 F.3d at 194-95. These courts have therefore adopted a case-specific approach that examines the particular allegations in their entirety to determine whether they provide the requisite strong inference, "without regard to whether those allegations fall into defined, formalistic categories such as 'motive and opportunity.'" *Fleming Cos.*, 264 F.3d at 1263. Still, these circuits generally agree that specific facts showing a motive and opportunity to commit fraud (or the absence of such facts) may be relevant in determining whether a plaintiff's complaint

demonstrates a strong inference of scienter. *See, e.g.*, *id.*; *Helwig*, 251 F.3d at 550-51; *Greebel*, 194 F.3d at 197.

We agree that a flexible, case-specific analysis is appropriate in examining scienter pleadings. Both the absence of any statutory language addressing particular methods of pleading and the inconclusive legislative history regarding the adoption of Second Circuit pleading standards indicate that Congress ultimately chose not to specify particular types of facts that would or would not show a strong inference of scienter. *See Helwig*, 251 F.3d at 551 ("In enacting the PSLRA, Congress was concerned with the quantum, not type, of proof."); *Greebel*, 194 F.3d at 195 ("The history and text [of the PSLRA] show no agreement to restrict the types of evidence which may be used to show a strong inference of scienter."). We therefore conclude that courts should not restrict their scienter inquiry by focusing on specific categories of facts, such as those relating to motive and opportunity, but instead should examine all of the allegations in each case to determine whether they collectively establish a strong inference of scienter. And, while particular facts demonstrating a motive and opportunity to commit fraud (or lack of such facts) may be relevant to the scienter inquiry, the weight accorded to those facts should depend on the circumstances of each case.

## C.  *Application to Present Facts*

Having set forth the applicable legal standards, we now examine the allegations in Appellants' complaint to determine whether Appellants have pleaded the disputed elements of their claims with sufficient particularity. Appellants allege that Appellees (1) misrepresented the number of NovaCare practitioners that departed after the NovaCare acquisition and the reason for their departures, (2) failed to promptly disclose NovaCare's different revenue recognition method, and (3) failed to promptly disclose the reduction in referral business due to the acquisition. Appellants also make a series of "catch-all" allegations that purportedly demonstrate Appellees' motives to misrepresent or conceal these facts. We consider each of these allegations in turn.

1.  *Practitioner Departures*

a.  *Number of Departures*

Appellants claim that during the November 8 call, Appellees misrepresented the number of NovaCare practitioners that had left the company after the acquisition closed on July 1, 1999. During that call, Stein made the following statement regarding practitioner departures:

> As a result of the acquisition and studying the historical numbers of NovaCare and along with the merging of these offices, we have realized that there [were] some practitioners that left NovaCare before the transaction took place—approximately 10 folks. And there were about 10 folks that left the organization. Some were terminated because they weren't producing. And there were a few that resigned. So as a resulting total of 20 practitioners leaving the organization, there was a loss of business totaling about $8 million.

J.A. 84. Stein also stated that "as a result of eliminating some of these branches that were not profitable businesses and the loss of some of these practitioners—and in some cases we terminated the practitioners—our margins are running better than expected, but our top line is a little bit less than what we initially forecasted." *Id.* at 85. Further, in response to an analyst's question regarding the departures, Sabel stated:

> I think we're very confident that there are certainly no indications of any kind of major defection. Keep in mind that out of the number of practitioner[s] that we lost the current number that we currently employ are 977 practitioners. And that's a pretty formidable number of practitioners. And, in fact, pre and post we've lost about 20 practitioners out of that group. So it's certainly not any kind of a trend that we see.

*Id.* at 93.

Appellants contend that the actual net number of practitioners that

departed after the July 1 closing but before the November 8 call was at least 18 (and possibly 19), *not* 10.[5] This allegation is based on comments by Stein during the January 7 call:

> I want to explain to you or share with you the trend that has taken place over the last six months since we've owned NovaCare. The net resignations in the company on a practitioner basis was seven in July. In August it was one. In September it was seven. In October it dropped to three. And in November it dropped to one, and then in December it dropped to seven—or it went back up to seven.
>
> And so you can see as of the end of November this trend— it was trending down. We thought this phenomenon was over. It bounced back in December, and we realized that we were starting to see this problem occur again.
>
> When you translate the loss of these practitioners into revenues, we've experienced a shortfall here in the fourth quarter of $2.25 million in revenue, or 9 cents per share, and on an annualized basis, just for the loss of the practitioners, it was $9 million or 17 cents per share for year 2000.

*Id.* at 102-03. Later in the call, Sabel explained that "what we've had is a small number of practitioners that have defected and have inflicted serious damage. I'm not trying to diminish the damage that they've inflicted, but we have almost 950 practitioners still within this system." *Id.* at 112.

Appellants further claim that Appellees' misrepresentations regard-

---

[5]Appellants suggest that the 10 post-acquisition departures that Appellees mentioned in the November 8 call ostensibly included all departures up to the time of that call, not just those during the third quarter ending on September 30. Appellants also claim the 18 or 19 post-acquisition departures were in addition to the approximately 10 practitioners that Appellees indicated had left NovaCare before the acquisition closed. Because the limited record is not conclusive on these points, and because we must draw all reasonable factual inferences in Appellants' favor, we accept these allegations as true for purposes of this appeal.

ing the number of practitioner departures were material, based on a statement by Stein during the January 7 call that a practitioner's referral business "could be a half a million dollars" and that "a good portion of that just drops through to [earnings]." *Id.* at 109. Appellants also point to Sabel's statement during the January 7 call that the practitioner departures had "inflicted serious damage." *Id.* at 112.

Appellees' statements during the November 8 call regarding the number of practitioner departures were factual statements that were demonstrably true or false, and Appellants have adequately alleged that they were false. Appellees claim that these statements were not material because although Appellees may have misstated the *number* of practitioners that had departed, they disclosed the *financial effect* of those departures by explaining that the departures had caused "a loss of business totaling about $8 million." *Id.* at 84. Appellants acknowledge that this $8 million figure accurately represented the revenue that had been lost during the third quarter of 1999 as a result of the pre- and post acquisition practitioner departures.[6] Appellants contend, however, that this figure did not include much of the lost revenue attributable to the eight or nine departures that Appellants failed to disclose because the financial impact of those departures would be primarily felt in later quarters.

We believe there is at least a factual issue regarding whether Appellees' disclosure of the $8 million in third quarter revenue losses due to practitioner departures adequately remedied the misstatement of the number of departures. Viewing the alleged facts in the light most favorable to Appellants, a reasonable investor could have been misled by the misstatement of the number of departures, despite the disclosure of the $8 million in third quarter lost revenue. Although most of the undisclosed departures apparently took place during the third quarter, many of those departures could have occurred during the latter part of that quarter and thus would have had a relatively modest effect on third quarter revenue and a correspondingly greater effect on fourth quarter revenue. Thus, despite knowing that the

---

[6]While the record is not clear regarding the exact time period during which this $8 million of revenue was lost, Appellants' contention that this figure represented third quarter losses is a reasonable interpretation of the record, and we will therefore accept it for purposes of this appeal.

departures had collectively caused $8 million in revenue losses during the third quarter, a reasonable investor could have underestimated the continuing *future* effects of the departures, based on the false understanding that there had only been 10 post-acquisition departures, as opposed to 18 or 19. We therefore conclude that Appellants have sufficiently pleaded that Appellees' misstatements concerning the number of practitioner departures were material.

Regarding scienter, Appellants claim that Appellees' statements during the January 7 call demonstrate that (1) they viewed the retention of practitioners as the most important factor in revenue growth, (2) they had been monitoring the departure numbers on a monthly basis, and (3) they had recognized prior to the November 8 call that the departures reflected a negative trend. These allegations do provide some indication that Appellees misstated the number of practitioner departures at least recklessly. On balance, however, other factors show that the requisite strong inference of scienter is lacking.

First, although Appellees clearly understated the number of post-acquisition departures during the November 8 call, their statements indicate that they were attempting to give a rough approximation of the number of pre- and post-acquisition departures, rather than a precise number. *See id.* (stating that "approximately 10" practitioners left before the acquisition); *id.* (indicating that "about 10" practitioners left after the acquisition); *id.* at 93 (stating that "pre and post [acquisition] we've lost about 20 practitioners"). Second, although the lost revenue attributable to each departure was substantial, the absolute number of the undisclosed net departures (8 or 9) was small in comparison to the overall number of practitioners employed by Hanger; given that Hanger was in the midst of a complex nationwide integration of NovaCare, there is a distinct possibility that, at the time of the November 8 call, Appellees had simply undercounted the number of practitioners across the country who had departed. Third, while the disclosure of the $8 million in third quarter revenue losses due to the departures may not have been adequate to correct the misstatement of the number of departures, it nonetheless militates against a finding that Appellees acted with a culpable state of mind. Fourth, Appellants do not allege a long-term effort by Appellees to conceal the number of practitioner departures; to the contrary, only two months after the alleged misstatements, Appellees clearly disclosed the correct number

of post-acquisition departures. Fifth, Appellants do not allege that Appellees had any personal motives to misrepresent the number of departures for a total of two months, such as to facilitate personal sales of Hanger stock.[7] *See Phillips*, 190 F.3d at 622-23. Finally, although Appellees' characterization of the practitioner departures was more positive during the November 8 call, *see id.* at 93 (stating that "it's certainly not any kind of a trend that we see"), Appellees plausibly explained during the January 7 call that, around the time of the November 8 call, they believed the departures were abating.

Given these circumstances, Appellees' misstatement of the number of post-acquisition departures is more consistent with negligence than with recklessness or intent. We therefore conclude that Appellants' allegations regarding the number of practitioner departures do not establish the strong inference of scienter required by the PSLRA.

### b.  *Reason for Departures*

Appellants also claim that during the November 8 call, Appellees misrepresented the reason for the practitioner departures by stating that "[s]ome" of the former practitioners "were terminated because they weren't producing," "[a]nd there were a few that resigned." *Id.* at 84; *see id.* at 85 (stating that "in some cases we terminated the practitioners"). By contrast, during the January 7 call, Appellees described the post-acquisition departures as "net resignations," *id.* at 102, never specifically stating that any practitioners had been terminated. Appellants further allege that the reason for the practitioners' departures was material because the firing of unprofitable practitioners would be viewed by investors as a positive financial move for the company, while practitioner resignations would be viewed as a negative development.

We question whether Appellants have adequately pleaded that Appellees' November 8 statements regarding practitioner termina-

---

[7]As discussed below in Section II.C.4, while Appellants' complaint includes allegations purportedly showing Appellees' motives to commit fraud, those allegations involve generalized corporate motives that courts have repeatedly found insufficient to establish a strong inference of scienter.

tions were false. To begin with, Appellees' discussion of practitioner departures during the January 7 call was limited to *post*-acquisition departures, while the discussion during the November 8 call also included *pre*-acquisition departures. Although Appellees' statements during the November 8 call are not clear on this point, it is possible that at least some of the terminations Appellees referred to during that call took place *before* the acquisition. Further, even assuming that all of the terminations Appellees mentioned during the November 8 call purportedly occurred after the acquisition, it seems unlikely that Appellees would completely fabricate this fact during the November 8 call and then retreat from it during the January 7 call. An equally likely explanation is that during the January 7 call, Appellees were describing the loss of practitioners generally as "net resignations" and did not specifically repeat that some of the former practitioners had been terminated. And, to the extent Appellants claim that Stein's statement during the November 8 call that "a few" practitioners had resigned was false, the word "few" in this context is subjective, particularly given Appellees' other indefinite statements that "some" of the practitioners were terminated. Nonetheless, we will assume for purposes of discussion that Appellants have properly pleaded that Appellees' statements concerning the reason for the practitioner departures were false.

With respect to materiality, Appellants are correct that, in the abstract, a reasonable investor might have found it important to know that Hanger was losing practitioners involuntarily rather than by its own strategic decisions. Viewing Appellees' statements in context, however, we question whether there is a substantial likelihood that a reasonable investor would have considered the reason for the departures to be significant. Again, the alleged misstatements related to a small number of departing practitioners when compared to the overall number of practitioners employed by Hanger. And, Appellees did disclose that some of the departing practitioners had resigned. While it is a close question, we will assume that Appellants have adequately pleaded that Appellees' alleged misstatements regarding the reason for the practitioner departures were material.

However, as with Appellees' statements regarding the number of departing practitioners, Appellants' complaint does not establish a strong inference that Appellees knowingly or recklessly misstated the

reason for the departures. As explained above, any inconsistency in the language used to describe the departures was just as likely the result of an overgeneralization as it was the product of intentional deception or recklessness. Further, given the small number of practitioners involved and the disclosure that some of them resigned, we cannot conclude that Appellants' allegations present a strong inference of reckless conduct, much less intentional conduct.

### 2.    *Revenue Recognition*

Appellants further allege that Appellees artificially inflated Hanger's 1999 third quarter revenue and earnings by failing to disclose certain issues concerning revenue recognition by NovaCare. Stein explained during the January 7 call that Appellees had discovered in late December 1999 that NovaCare was using a method for recognizing revenue that was different from, and less conservative than, Hanger's publicly stated policy. While Hanger did not record revenues until after orthotic or prosthetic devices were accepted by patients, NovaCare recorded revenues for devices that had been completed but had not yet been delivered to patients. Stein further explained that this different method for revenue recognition at NovaCare arose from verbal communications among NovaCare field managers rather than a written policy, and that he had recently discovered this practice through a conversation with some of NovaCare's regional managers. According to Stein, once Appellees learned of this differing method of revenue recognition, they conformed NovaCare's practice to Hanger's. Stein reported that this change, which took effect during the fourth quarter of 1999, reduced revenue for that quarter by $4 million and earnings per share by $0.13, and that it would reduce projected 2000 revenue by $4 million.

Appellants allege that Appellees represented in public filings that Hanger was using its stated revenue recognition policy for all customer transactions during the third quarter of 1999, when in fact it was not. Thus, Appellants have adequately pleaded that Appellees made false statements or omissions.[8] Further, while the precise finan-

---

[8]We disagree with the district court that Appellants were required to "allege particular transactions where revenues were improperly recorded,

cial impact of the discrepancy in revenue recognition methods during the third quarter is unclear, the significant effect of reconciling these methods on Hanger's subsequent financial results suggests that the alleged misrepresentations and omissions were material.

Once again, however, Appellants have failed to allege particular facts that provide a strong inference that Appellees made these statements and omissions intentionally or recklessly. In their complaint, Appellants set forth a variety of facts that they claim demonstrate Appellees' scienter. For example, Appellants allege that certain Nova-Care executives were employed by Hanger after the acquisition and that Appellees had access to NovaCare documents. But Appellants do not explain how those former NovaCare employees necessarily would have recognized the difference in revenue recognition systems any more quickly than Appellees did. Nor do Appellants explain how the particular NovaCare documents possessed by Hanger would have revealed the discrepancy—especially given Stein's statement during the January 7 call that NovaCare's revenue recognition practices were derived from verbal communications among managers rather than any written policy.

Appellants also point to the fact that NovaCare accounted for over half the facilities and revenue of the combined company. However, this fact alone does not demonstrate that the relatively subtle difference in revenue recognition practices was so obvious that Appellees

---

including the names of customers, the terms of specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions." J.A. 332. Appellants' claim is that Appellees' failure to disclose NovaCare's differing revenue recognition method affected revenue and earnings in the aggregate—a claim that is generally supported by the effect on Hanger's financial results of conforming the two companies' practices. It is inappropriate at the pleading stage, before any discovery, to require Appellants to cite specific transactions for which the NovaCare recognition method was used. *See Mesko v. Cabletron Sys., Inc.* (*In re Cabletron Sys., Inc.*), 311 F.3d 11, 32-33 (1st Cir. 2002) (indicating that although securities plaintiffs must plead fraudulent conduct with particularity, they need not allege all of the precise details underlying that conduct, especially when there has been no discovery).

must have been aware of it, especially in the midst of a complex nationwide integration of the two businesses.

In addition, Appellants allege that the same outside accounting firm performed audits of financial statements for both Hanger and Nova-Care during 1999. This allegation, however, does not show that the accounting firm recognized—in the course of these apparently separate audits—that the two companies used different methods for recognizing revenue, much less that the firm brought the issue to Appellees' attention.

In short, as the Sixth Circuit concluded in affirming the dismissal of another case involving allegations of improper revenue recognition, Appellants "have failed to plead facts that show that the revenue recognition errors at [NovaCare] should have been obvious to [Appellees] or that [Appellees] consciously disregarded 'red flags' that would have revealed the errors prior to their inclusion in public statements." *Hoffman v. Comshare, Inc.* (*In re Comshare, Inc. Sec. Litig.*), 183 F.3d 542, 554 (6th Cir. 1999); *see also Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (explaining that without facts showing "corresponding fraudulent intent," "allegations of . . . accounting irregularities, standing alone, are insufficient to state a securities fraud claim" (internal quotation marks omitted)).

### 3.  *Referral Business*

Appellants also claim that Appellees failed to disclose the reduction in referral business from rehabilitation clinics due to the combination of Hanger and NovaCare into a single company. Stein explained during the January 7 call that because the two companies were now viewed as one, rehabilitation clinics were referring a smaller percentage of patients to company practitioners on a rotating basis, based on rules established by the clinics. Before the acquisition, Hanger and NovaCare practitioners each received one-third of patient referrals (for a combined total of two-thirds), with independent practitioners receiving the remaining third. But after the two companies were combined, company practitioners only received one-half of the referral business. According to Stein, the independent "mom and pop" practitioners, using these rules "as a tool," had "been out in the faces of these rehab systems telling them Hanger and NovaCare is one

company now so they should only get one out of two patients." J.A. 111. Stein explained that this decline in referral business reduced fourth quarter revenue by $750,000 and earnings by $0.03 per share, and that it would reduce projected 2000 revenue by $2 million and projected earnings by $0.05 per share.

Appellants do not allege any specific misrepresentations by Appellees concerning referral business. Rather, Appellants claim that because Appellees made positive comments during the November 8 call regarding the integration of the two businesses, Appellees had a duty to disclose the lower percentage of patient referrals. These allegations sufficiently plead that Appellees made a misleading omission concerning referral business. And, given the effect of the loss of referral business on Hanger's financial results, this omission was likely material.

Again, however, Appellants' allegations do not establish the strong inference of scienter required by the PSLRA. Appellants point to a statement by Stein during the January 7 call, in reference to the referral business issue, that "[s]ome of this we spoke to you folks about in the third quarter, and there's a little bit of this left here in the fourth quarter." *Id.* at 101. Appellants contend this statement shows that Appellees knew about the referral issue before the November 8 call. While this may be true, Stein's statement also indicates that Appellees had previously disclosed the referral issue to analysts, undercutting Appellants' claim that Appellees concealed the issue until the January 7 call.

Appellants further contend that Stein's comments regarding the independent practitioners lobbying the rehabilitation clinics to treat Hanger and NovaCare as one company indicate that Appellees knew that the clinics' rules could lead to reduced referral business, but that Appellees tried to conceal this issue to prevent the independent practitioners from learning of the acquisition. This allegation, however, overlooks that the independent practitioners could have easily learned about the acquisition through a variety of other sources.

4.  *Additional Scienter Allegations*

Finally, Appellants make a series of allegations that they claim demonstrate Appellees' scienter. All of these allegations relate to pos-

sible financial motives to misrepresent Hanger's financial situation, such as maintaining positive relationships with creditors, avoiding additional interest payments, and promoting future acquisitions. However, courts have repeatedly rejected these types of generalized motives—which are shared by *all* companies—as insufficient to plead scienter under the PSLRA. *See, e.g.*, *Fleming Cos.*, 264 F.3d at 1269; *see also Mesko v. Cabletron Sys., Inc.* (*In re Cabletron Sys., Inc.*), 311 F.3d 11, 39 (1st Cir. 2002) ("'[C]atch-all allegations' which merely assert motive and opportunity, without something more, fail to satisfy the PSLRA."). As we explained in *Phillips*, "[i]n order to demonstrate motive, a plaintiff must show concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged. Merely alleging facts that lead to a strained and tenuous inference of motive is insufficient to satisfy the pleading requirement." *Phillips*, 190 F.3d at 621 (citation & internal quotation marks omitted).

## III.

In sum, Appellants' allegations fail to provide the strong inference of scienter required by the PSLRA. Even when viewed collectively, these allegations tend to establish, at most, a pattern of negligent conduct by Appellees, rather than the reckless or intentional conduct required to support liability. Accordingly, we affirm the dismissal of Appellants' complaint.

*AFFIRMED*