**In re INSPIRE PHARMACEUTICALS, INC. SECURITIES LITIGATION**

**This Document Relates to: All Actions.**

**Master File No. 1:06CV00201.**

United States District Court, M.D. North Carolina.

July 26, 2007.

James Anthony Penry, Cynthia A. O'Neal, Taylor Penry Rash & Riemann, PLLC, Raleigh, NC, Joseph E. White, III, Christopher S. Jones, Maya Saxena, Saxena White P.A., Boca Raton, FL, Robin Winchester, Christopher Nelson, Schiffrin & Barroway, LLP, Radnor, PA, for Plaintiffs.

Barry M. Kaplan, Wilson Sonsini Goodrich & Rosati, Seattle, WA, C. Paul Chalmers, Scott A. Lowry, Wilson Sonsini Goodrich & Rosati, P.C., Washington, DC, Daniel R. Taylor, Jr., William Mark Conger, Kilpatrick Stockton, L.L.P., Winston–Salem, NC, for Defendants.

## ORDER AND JUDGMENT

OSTEEN, District Judge.

In this Standing Order 30 proceeding, the Magistrate Judge has recommended that Defendants' Motion to Dismiss be granted. Lead Plaintiffs filed a timely objection to the Recommendation and Defendants responded to the objections.

This court has conducted a review of the file and has determined that the Recommendation of the Magistrate Judge is appropriate and should be adopted.

For the reasons set forth in the Magistrate Judge's Recommendation of May 14, 2007,

IT IS ORDERED AND ADJUDGED that Defendants' Motion to Dismiss (Doc. No. 21) is granted and this action is dismissed with prejudice.

## RECOMMENDATION OF MAGISTRATE JUDGE ELIASON

RUSSELL A. ELIASON, United States Magistrate Judge.

On March 27, 2006, following consolidation of five shareholder class action lawsuits into a single civil action, Plaintiffs filed a consolidated class action complaint in this Court against Inspire Pharmaceuticals, Inc. ("Inspire") and certain of its senior officers. The complaint alleges violations of Securities and Exchange Commission Rule 10b–5, sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934, and sections 11, 12(a) and 15 of the Securities Act of 1933. It particularly focuses on Defendants' allegedly false and misleading statements regarding a Phase 3 FDA clinical trial of diquafosol, Inspire's development drug for the treatment of dry eye disease.

Relying on the Private Securities Litigation Reform Act of 1995 ("PSLRA" or "the Act") and Federal Rules of Civil Procedure 9(b) and 12(b)(6), Defendants now move to dismiss the Complaint for failure to plead fraud with particularity and failure to state a claim upon which relief can be granted. Specifically, Defendants claim that Plaintiffs failed to allege sufficient facts to support their fraud claim or sufficiently allege that Defendants' statements were made with the requisite scienter.

Defendants also contend that the Complaint's failure to sufficiently allege misrepresentation is fatal to Plaintiffs' separate claims under Sections 20(a) and 20A of the Exchange Act, and Sections 11, 12(a)(2), and 15 of the Securities Act. As will be seen, to successfully state a claim under any of these sections, Plaintiffs must first plead a predicate violation of securities fraud under section 10(b) of the Exchange Act or Rule 10b–5.

### Facts

Inspire, a biopharmaceutical company, developed diquafosol as a potential treatment for dry eye disease. Diquafosol was the first drug for which the company sought FDA approval for commercial use, and it did so only after nearly six years of development. Once preclinical studies showed promising data regarding the drug, Inspire received permission from the FDA to begin a sequence of clinical trials to determine the drug's efficacy and the nature of any side effects. For all new drugs, the FDA requires three phases of clinical trials, with Phase III studies providing the pivotal risk-benefit and efficacy statistics necessary for a drug to gain approval. Accordingly, Inspire conducted two Phase III clinical trials—Studies 104 and 105—before submitting a New Drug Application to the FDA.

Both of the Phase III studies built on the relative success of Study 103, which was a Phase II trial. Study 103 demonstrated significant improvements both objectively, i.e., through signs of eye health, and subjectively, i.e., in terms of reported symptoms, though the results did not meet all of the company's desired endpoints in either category. Like Studies 104 and 105, Study 103 had a primary objective endpoint of "improvement in mean corneal staining scores." Corneal staining refers to a procedure using a fluorescein fluid to highlight damaged areas on the surface of the eye. A corneal staining score of five indicates extensive damage, while a score of zero indicates no damage, or "corneal clearing." Therefore, to achieve improvement in mean corneal staining scores, a study must show a statistically significant improvement in the average corneal staining scores of test subjects. If a meaningful number of subjects demonstrate a complete absence of staining by the end of a study, the drug has also achieved corneal

clearing. Notably, both corneal clearing and improvement in mean corneal staining may be classified as "corneal staining endpoints" because they utilize the same staining process.

The primary endpoints for Inspire's first Phase III trial, Study 104, were both an objective endpoint of improvement in mean corneal staining scores and a subjective endpoint of improvement in patients' self-reported worst symptoms. Unfortunately, the study did not result in statistically significant objective improvement. In contrast, Study 105 employed the same primary objective endpoint and demonstrated a highly significant improvement in mean corneal staining scores. While Study 105 narrowly missed its primary subjective endpoint of clearing foreign body sensation, Inspire disclosed that the study had achieved corneal clearing in a statistically significant number of patients.[1]

In June 2003, Inspire submitted a New Drug Application to the FDA based on its Phase III trials, particularly the apparent success of Study 105. Later that year, Inspire received an "approvable" letter from the FDA, which stated that diquafosol could be approved if the company met one of two conditions: (1) conduct two additional studies with both objective and subjective endpoints, or (2) conduct one additional study to replicate the corneal clearing results of Study 105. Because no study had ever succeeded in simultaneously meeting both objective and subjective endpoints, Inspire chose the second option.

For proprietary reasons, the company also chose to keep the details of its new Phase III trial, Study 109, secret. When Inspire publically announced on January 30, 2004 that it would conduct such a trial, it only disclosed that it was working with the FDA to establish a protocol and that the purpose of Study 109 was to substantiate diquafosol's efficacy. Later, on November 4, 2004, Inspire CEO Christy Shaffer ("Shaffer") stated to one analyst that the study had "a corneal staining endpoint," but the specific endpoint, i.e., corneal clearing, was never officially revealed. Nevertheless, most analysts took it upon themselves to speculate that Study 109's primary endpoint was simply improvement in mean corneal staining, as in the company's previous studies.[2]

Inspire conducted two offerings of its common stock during 2004 in order to finance its development of diquafosol, one in July and another in November, and the company issued separate prospectuses for each. Both offerings were firm commitment offerings, meaning that neither Inspire nor its officers sold stock directly to the public. Instead, all stock was first sold to underwriters.

Unfortunately, Inspire learned in February 2005 that the results of Study 109 were not statistically significant enough to meet its corneal clearing endpoint. The company's stock price dropped when these results were announced on February 9, 2005, and purchasers of stock from the July and November 2004 offerings reacted

---

1. The term "clearing" takes on two unrelated meanings in this context. Corneal clearing refers to the *objective* clearing of eye damage. A patient may also report a *subjective* clearing of symptoms, e.g., a clearing of foreign body sensation in the eye.

Inspire presented a paper detailing the corneal clearing results achieved in Study 105 at the Association for Research in Vision and Ophthamology's annual conference in May

2003. This paper defined corneal clearing as a corneal staining score of zero and was publicized by both Inspire and securities analysts, who described the results as "clearing of corneal staining." (Chambers Decl. Ex. 4)

2. It is not clear just how much improvement the analysts thought would be required in Study 109 and what possible basis they could have used for such speculation.

by filing class action lawsuits in this Court. These suits, now consolidated into the present action, name Inspire, Shaffer, and two former company officers, Gregory Mossinghoff and Gary Novack, as Defendants. Plaintiffs claim that Defendants' oral and written statements between May 10, 2004 and February 8, 2005 misled the market as to Study 109's true endpoint. Defendants now move to dismiss the Complaint for failure to plead fraud with particularity and failure to state a claim upon which relief can be granted.

### Discussion

Rule 9(b) of the Federal Rules of Civil Procedure carves out an exception to the general requirement that a plaintiff need only set forth "a short and plain statement of the claim showing that [he or she] is entitled to relief." Fed.R.Civ.P. Rule 8(a). Specifically, Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." While this rule was intended to sort out and dispose of unfounded fraud claims at an early stage of litigation, its inconsistent application by the courts failed to prevent abusive practices in many private securities fraud actions. *See Teachers' Ret. Sys. v. Hunter,* 477 F.3d 162, 171 (4th Cir.2007). Consequently, Congress enacted the PSLRA in an effort to strengthen and clarify pleading requirements and discourage frivolous securities claims. *Id.* This Act mandates that:

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). In short, the PSLRA requires that plaintiffs plead sufficient *facts* to support any claim of material misrepresentation under section 10(b) of the Exchange Act or Rule 10b–5.

■■■ In the context of a Rule 12(b)(6) motion to dismiss, the PSLRA represents a departure from the general scheme of the Federal Rules, which allow a court to take into account *any* set of facts that could be proved consistent with the allegations of the complaint, even though such facts have not been specifically alleged. Instead, the Act authorizes courts to assume that the plaintiff has stated *all* of the facts upon which he bases his allegation of a misrepresentation. *Hunter,* 477 F.3d at 172. If a complaint fails to state sufficient facts to permit a reasonable person to find that the defendant made a false or misleading statement, the motion to dismiss should be granted. *Id.* at 174 (citing *Novak v. Kasaks,* 216 F.3d 300, 313–14 (2d Cir.2000)). Formulaic or conclusory allegations cannot satisfy the requirements of the PSLRA and Rule 12(b)(6); rather, specific facts must be alleged to support a reasonable belief that the statement was, in fact, misleading. *Hunter,* 477 F.3d at 175. A failure to provide such facts has implications for other Exchange Act and Securities Act claims as well, since many of these claims, including those articulated by the Plaintiffs, require a primary claim of securities fraud under section 10(b) or Rule 10b–5.[3] *See, e.g., Greenhouse v. MCG Capital Corp.,* 392 F.3d 650, 657 n. 7 (4th Cir.2004).

■■■ The complaint at issue in this case sets out numerous statements which Plaintiffs claim were misleading. Plaintiffs contend that these statements, in the form of press releases, prospectuses, and oral and written statements by Inspire CEO

---

3. This claim is contained in Count IV against Inspire and the individual Defendants.

Christy Shaffer, "failed to disclose that the FDA mandated primary endpoint for Study 109 was not mere improvement in mean corneal staining as in the earlier Phase III trial, Study 105, but a more difficult to achieve corneal clearing." (*See, e.g.,* Compl. ¶¶ 117, 128, 141.) However, other than this recurring, conclusory allegation, Plaintiffs provide little to support their misrepresentation claims. They particularly fail to explain *how* each of Defendants' statements misled investors or even show that investors were misled by Defendants at all.

While Defendants did, as Plaintiffs claim, label Study 109 as a "confirmatory" study, the Complaint offers no evidence to support Plaintiffs' assertion that the mere use of the word "confirmatory" misled them to "believe that Study 109 was simply the same as the three prior Phase III studies."[4] (Compl. ¶ 69.) Notably, the Complaint itself reveals that prior trials of diquafosol—namely Studies 103, 104, and 105—differed not only from Study 109, but from each other in terms of subjective primary endpoints, objective and subjective secondary endpoints, and protocols. (Compl. ¶¶ 49–53.) Further, and contrary to Plaintiff's assertions, Defendant Shaffer's statement that Studies 105 and 109 employed "very similar" protocols did not imply that both studies were *identical,* or even that they shared the same primary endpoint. (*See* Compl. ¶¶ 116–117.) In

fact, the July 2004 Prospectus, as quoted in the Complaint, suggests otherwise. It conveys that Defendants were "working closely with [the FDA] to develop a protocol" for Study 109 so that the study would meet the FDA's "additional requirement" for regulatory approval, i.e., a requirement not addressed in previous studies. (Compl. ¶ 67.) Moreover, Defendants emphasized from the beginning of Study 109 that its FDA-mandated endpoint, eventually revealed to be corneal clearing, was not disclosed by name for purely competitive reasons. (Chamber Decl. Ex. 10.) Considering these facts, a fraud claim based on Defendants' failure to disclose the endpoint is meritless, and speculation by investors and analysts that Study 109 would be a simple repeat of the prior Phase III studies was self-deluding and ill-founded. Plaintiffs' conclusory argument to the contrary, interspersed with little more than Defendants' out-of-context statements, is insufficient to support a claim of misrepresentation.

Even Defendant Shaffer's statement to analyst David Steinberg that Study 109 had "a corneal staining end point" does not sustain Plaintiffs' misrepresentation claim. (*See* Compl. ¶ 135.) First, the statement did not specify any particular endpoint. Second, like the allegations above, this claim totally lacks the supporting facts showing there to be a misrepresentation as required by the PSLRA.[5] The Complaint

4. In addition to Phase III Studies 104 and 105, the third Phase III trial to which Plaintiffs ostensibly refer is Study 108, which differed substantially from Inspire's other trials of diquafosol and which the FDA declined to include in the approval process. (*See* Compl. ¶ 57.)

5. Plaintiffs' argument rests on the view that corneal clearing is impossible to achieve and, therefore, Defendants had a duty to reveal that corneal clearing was the endpoint of Study 109. (Pls.' Br. 14–15.) The basis for

this contention is that, according to some clinicians and a couple of ophthalmologists, corneal clearing is more difficult, if not "nearly impossible," to achieve. (Compl. ¶¶ 111 & 112.) Nothing is mentioned about what the FDA actually expected. According to Plaintiffs, the FDA mandated an "impossible" test that necessarily would fail. This is a rather extraordinary claim and, therefore, requires a solid factual statement for support. The Court finds the purported experts' off the cuff statements wholly deficient to prove the claim. The "experts'" statements raise more

itself clearly confirms the possibility that corneal clearing is simply one type of corneal staining endpoint. First, it asserts that "[c]orneal staining is assigned a number score of zero to five based on the number of stained or damaged areas" and that one possible corneal staining endpoint is "a statistically significant improvement (i.e., decrease) in mean corneal staining scores." (Compl. ¶ 48.) Later, the Complaint defines corneal clearing as "the complete absence of stains indicating damage to the surface of the eye," or, in other words, a corneal staining score of zero. (*See* Compl. ¶ 108.) Thus, while Shaffer, for good reasons only spoke in shorthand terms and possibly was not as clear as she could have been, her statement is not false or misleading.[6] To the extent it may be confusing to a layman to refer to corneal clearing as a type of corneal staining endpoint, a layman has no right to impose his or her own scientific requirements or terminology on Defendants or the FDA. Plaintiffs also argue that because the analysts engaged in improper assumptions and speculation, Defendants were obligated to reveal all of the details of Study 109 at some point. However, Plaintiffs fail to show this to be the law or even provide a meaningful basis for anyone to know when such a point would ever arrive.

Even assuming there was a misstatement by the executive, not every misstatement is grounds for a lawsuit. Everyone involved in this case, including the Plaintiffs, knew that their investment involved a substantial degree of risk. Because Defendants openly announced that it was their competitive strategy not to reveal the primary endpoint of Study 109, Plaintiffs specifically knew or should have known that any analysts' claims on this matter were speculative at best. The Complaint shows that Plaintiffs relied on the wildly speculative statements made by analysts who predicted Study 109 would be a success. But Plaintiffs also knew that the analysts did not speak for Defendants and, in fact, were not even scientists. Their assertions as to the study's endpoint were well outside of their realm of knowledge and expertise. Plaintiffs real beef is with the analysts. In any event, Plaintiffs' failure to allege sufficient facts to support a misrepresentation claim based on Shaffer's statement precludes the claim from going forward.

■ Another reason for dismissal lies in the fact that the PSLRA, in addition to requiring particularized pleading of supporting facts as discussed above, also significantly heightens the pleading standards for alleging scienter. While Rule 9(b) permits state of mind to be averred generally, the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15

---

questions than providing answers and, for this reason alone, are insufficient.

More significantly, one of Inspire's previous studies, Study 105, had apparently already demonstrated corneal clearing. In fact, three analyst reports from Morgan Stanley told investors that Study 105 showed "a significantly higher percentage of clearing of corneal staining in both treatment groups at weeks 6 and 8." (Chambers Decl. Ex. 6 at 30.) As stated previously, these corneal clearing results were also presented in a paper at a major eye conference prior to the class period. Thus,

corneal clearing would seem to be far from "impossible," and failure to use that terminology to describe the endpoint provides no basis for a securities fraud claim. Moreover, in as much as the term corneal clearing was already used by analysts in describing Study 105, the use of it to describe Study 109 would not have made a difference.

6. In addition, because Shaffer's statement was made on November 4, 2004, it had no bearing on stock purchased during the company's July offering.

U.S.C. § 78u–4(b)(2). Thus, to support a securities fraud claim under section 10(b) of the Exchange Act and Rule 10b–5, Plaintiffs must allege facts to support a "strong inference" that each defendant acted with "intent to deceive, manipulate, or defraud" or with "severe recklessness" regarding the danger that Plaintiffs would be misled. *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343–344 (4th Cir.2003).

In the present case, Plaintiffs attempt to contrive circumstantial evidence in order to support an inference that Defendants acted with the scienter required by the PSLRA. The Complaint sets forth two interrelated arguments on this point: (1) Defendants had the motive and opportunity to defraud investors, and (2) individual Defendants' insider trading implies intent or recklessness. These arguments ultimately fail to raise an inference, much less a "strong inference," of scienter.

■ First, Plaintiffs take a significant leap from their allegations of motive and opportunity to their conclusion of intent—all without providing sufficient facts to connect the two. For example, the Complaint alleges that "Defendants had access to material, nonpublic information concerning, *inter alia*, the Company's true financial condition, the prospects for the Company's lead development drug, diquafosol, and the primary endpoint required by the FDA for the 'confirmatory' Phase III trial of diquafosol." (Compl. ¶ 185.) It also describes Inspire as "a company hemorrhaging cash and reporting ever increasing net losses." (Compl. ¶ 2.) Under Plaintiffs scenario, Defendants decided to conduct Study 109, which it (and the FDA) knew would necessarily fail, in order to raise money through a stock offering. While perhaps not absolutely inconceivable, the conclusory, if not wildly speculative, allegations, along with some facts, while arguably demonstrating a possible motive, lend nothing to actually suggest that Defendants' made their public offerings based on these motives, let alone that they did so with "severe recklessness" or intent to defraud.

■ Plaintiffs' insider trading claim is equally unpersuasive. It alleges that "[n]otwithstanding the duty not to sell Inspire common stock under these circumstances, or to disclose the insider information prior to selling the stock, Defendants Shaffer, Mossinghoff and Novack sold Inspire stock at prices that were artificially inflated by Defendants' material false and misleading statements and omissions." (Compl. ¶ 186.) While Defendants undeniably sold a number of their shares during the class action period, sales alone provide no grounds for Plaintiffs' securities fraud claim. Notably, Plaintiffs fail to state facts to support their claim that Study 109 was entirely fraudulent and could not succeed. *See* n. 5. Without such facts, there is no evidence that Defendants undertook their sales with the intent to defraud.

To overcome this hurdle, Plaintiffs alternatively offer details of the three Defendants' sales during the class period—including the number of shares sold on each date and the corresponding price per share—in an attempt to prove the suspicious nature of the sales themselves. (*see* Compl. ¶¶ 187–193.) For Shaffer, Plaintiffs also include the same information regarding her pre-class period sales. (Compl. ¶ 189.) However, both the analysis by Plaintiffs of these figures and the figures themselves fail to strongly infer scienter.

■ First, as the Fourth Circuit has held, insider trading implies scienter "only if the timing and amount of a defendant's trading [is] 'unusual or suspicious.'" *Hunter*, 477 F.3d at 183. Thus, Plaintiffs

must provide the *context* for Defendants' sales in order to support their claim. Here, Plaintiffs state that two defendants, Novack and Mossinghoff, did not sell any Inspire stock in the two years prior to the class period or at any time since their sales in November 2004. (Compl. ¶¶ 190–91.) However, the Complaint also reveals that both men resigned from Inspire around the time of their sales (Compl. ¶ 192.), indicating that their departures, rather than an intent to defraud, may have prompted them to sell their stock. In addition, the Complaint shows that the sales during the class period occurred at prices that were not particularly high.[7] (*See* Compl. ¶¶ 189–191.)

Plaintiffs' emphasis on the size of Shaffer's November 2004 sale is similarly misplaced. While it is true that this sale, at 10,000 shares, was far larger than the 2,000 shares per month Shaffer sold prior to the class period, the Complaint reflects that Shaffer did not sell any of her shares in September or October of 2004, which, significantly, were also during the class period. (Compl. ¶ 189.) Thus, the jump in shares sold may indicate a simple catch-up sales effort just as easily as an illicit attempt to dump stock before a price drop.

More significantly, the Plaintiffs never compare the amount of stock sold by Defendants during the class period with their total holdings. As Defendants point out, the amount of stock sold by each Defendant during the class period was "a very small percentage of their total shares and vested options." (Defs.' Br. 19.) In fact, Mossinghoff, Novack, and Shaffer sold only 12, 13, and 3 percent, respectively, of their total holdings in the company during

the time in question. (*See* Defs.' Br. 19–20; Chambers Decl. Exs. 29–31.) Defendants also point out that these individuals "acquired more stock during the Class Period than they sold." (*Id.* at 20.) The sum of this evidence will not support any inference that Defendants acted with the requisite scienter in terms of their stock sales, let alone that raise the *strong* inference required under the PSLRA. In fact, sales as de minimus as Shaffer's may even *negate* any inference of scienter. *In re First Union Corp. Sec. Litig.*, 128 F.Supp.2d 871, 898 (W.D.N.C.2001). Plaintiffs attempt to thwart these conclusions by arguing that "Defendants have improperly counted vested, unexercised stock options as part of their beneficially owned shares." (Pls.' Br. 22.) In other words, Plaintiffs contend that Defendants' sales should be considered only as compared to stock that they actually owned, not stock they could have owned. However, Plaintiffs offer no case law from this circuit to support their argument, nor do they provide an alternative account of Defendants' actual holdings. In sum, Plaintiffs have not shown that Defendants' statements were made with scienter required by the PSLRA. This failure serves as an additional and independent ground for dismissal of the Complaint.

■ Plaintiffs' remaining claims under the Exchange Act and the Securities Act also merit dismissal, principally for failure to sufficiently allege any underlying false statement. First, Exchange Act Counts V and VI in the Complaint allege violations of Sections 20(a) and 20A of the Exchange Act. Section 20(a) imposes liability on "ev-

---

7. For example, Shaffer sold stock during the class period at an average price per share of $16.95, while her pre-class period sales averaged $15.74. Notably, shares did not consistently reach their highest sales prices during the class period, but in late 2003, when they averaged $17.66 per share. Similar price comparisons are not available for Novack and Mossinghoff, whose sales averaged $17.95 and $17.46 per share, respectively, during the class period, because neither Defendant sold shares outside of that time frame.

ery person who, directly or indirectly, controls any person liable under any provision of this chapter," 15 U.S.C. § 78t(a), while Section 20A creates a private right of action against those who engage in insider trading, 15 U.S.C. § 78t–1(a). The Fourth Circuit has held that to state a claim under either section, Plaintiffs must plead a predicate violation of law. *Hunter*, 477 F.3d at 188. Specifically, Plaintiffs must state a primary claim for securities fraud under Section 10(b) and Rule 10b–5. *Id.* Because the Complaint fails to sufficiently allege that Defendants made any misleading statement or omission in violation of these rules, Counts V and VI must be dismissed.

■■■■ Similarly, Plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act, set out as Securities Act Counts I and II, cannot succeed in the absence of misleading statements. Section 11 only provides investors with a cause of action where a registration statement contains a materially misleading statement, 15 U.S.C. § 77k(a), while Section 12(a)(2) requires the same with respect to prospectuses and oral communications, with special consideration for the circumstances under which the statements were made, 15 U.S.C. § 77*l*(a)(2). Without the predicate statements, no cause of action exists under these sections.[8]

The same is true for Plaintiffs' claim in Count III under Section 15 of the Securities Act, 15 U.S.C. § 77o. *See Greenhouse*, 392 F.3d at 657 n. 7. As the Fourth Circuit noted in *Greenhouse*, "[t]hese provisions are, essentially, dependent derivatives of their parent statutes, and are thus properly dismissed if the parent statutes

fail to state a claim upon which relief may be granted." *Id.* Consequently, none of Plaintiffs' claims survive Defendants' motion.

**IT IS THEREFORE RECOMMENDED** that Defendants' motion to dismiss (docket no. 21) be granted.

May 14, 2007.

---

8. Because Plaintiffs' Section 11 and 12(a)(2) claims must be dismissed on this ground, the Court need not reach Defendants' additional arguments that (1) Plaintiffs fail to adequately allege standing under Section 11, (2) Plaintiffs lack standing to pursue a claim under Section 12(a)(2), and (3) Defendants did not "offer or sell" stock to Plaintiffs as required by a Section 12(a)(2) claim.