**CITY OF ANN ARBOR EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, Plaintiff,**

v.

**SONOCO PRODUCTS CO., Harris E. DeLoach, Jr., and Charles J. Hupfer, Defendants.**

**Civil Action No. 4:08–cv–2348–TLW–SVH.**

United States District Court, D. South Carolina, Florence Division.

Oct. 19, 2011.

David Avi Rosenfeld, Coughlin Stoia Geller Rudman and Robbins LLP, Melville, NY, Jack Reise, Michael L. Greenwald, Stephen R. Astley, James L. Davidson, Jesse S. Johnson, Mark J. Dearman, Robbins Geller Rudmand and Dowd, Boca Raton, FL, William E. Hopkins, Jr., Beasley Allen Crow Methvin Portis and Miles, Montgomery, AL, for Plaintiff.

Elizabeth Patz Skola, John Allen Jordak, Jr., Lisa Rose Bugni, Todd R. David, Alston and Bird, Atlanta, GA, Manton McCutchen Grier, Robert Yates Knowlton, William Clarence Boyd, Haynsworth Sinkler Boyd, Columbia, SC, for Defendants.

## ORDER

TERRY L. WOOTEN, District Judge.

The City of Ann Arbor Employees' Retirement System, ("Plaintiff"), brought this

securities action pursuant to § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. Currently before the Court is a motion for summary judgment filed by Sonoco Products Co., Harris E. DeLoach, Jr., and Charles J. Hupfer, ("Defendants"). The motion alleges Plaintiff has failed to establish the following elements of a 10b–5 claim: 1) material misrepresentation or omission, 2) scienter, 3) loss causation, and 4) damages. Also before this Court is Defendants' motion to exclude the testimony of Plaintiff's loss causation and damages expert. Finally, Plaintiff has filed two motions to exclude the expert testimony of two of Defendants' witnesses. The first challenges an expert witness for Defendant on the grounds that his opinions are flawed and constitute impermissible legal conclusions. The second seeks to exclude the opinions of Defendants' expert on loss causation and damages.

### FACTS

Sonoco is a global supplier of industrial and consumer packaging and packaging services, headquartered in Hartsville, South Carolina. Sonoco 2006 10–K, p. 3 (Doc. # 125–5). At the start of 2007, Sonoco had 324 locations in 35 countries and realized approximately $3.7 billion in net sales for the year of 2006 and $195 million in net income. *Id.* at 16.

Plaintiff asserts that while Sonoco met or exceeded earnings estimates for fourteen periods, in late 2006, it provided certain customers price concessions and deductions. Additionally, Plaintiff alleges the flexible packaging division lost an account with one of its largest customers due to Sonoco's decision not to match a competing bid for the customer's business. Allegedly, the individual defendants were specifically informed of the price concessions and lost account as well as the financial impact these events would have prior to the start of the Class Period. Plaintiff also argues the budgets produced by the company and reviewed by Defendants included unrealistic improvements to productivity. Defendants allegedly cushioned the 2007 forecasts from the deleterious effects of the price concessions and lost volume by artificially inflating gains from productivity.

Plaintiff asserts that even though Defendants knew these issues would adversely impact financial results, Defendants failed to report this information. Moreover, Plaintiff contends this failure to disclose artificially inflated the company's stock price. The CEO sold 155,000 shares of stock during the Class Period. The Class Period begins on February 7, 2007, the date on which Sonoco issued a press release announcing its financial results for the fourth quarter and year end of 2006. It is on this date that Plaintiff asserts the company first made false or misleading statements to the market. Plaintiff also asserts the company should have disclosed information related to the difficulties flexible packaging faced in 2007 on this date. The Class Period ends on September 18, 2007, the date on which Sonoco lowered its third quarter 2007 earnings guidance. Plaintiff acknowledges this case is not the corporate meltdown similar to those that have been "garnering press attention." Hearing Tr. 67:4–19 (Doc. # 146). Nevertheless, Plaintiff alleges Sonoco failed to "compl[y] with the federal securities laws." *Id.*

### A. Principle Products/Reportable Segments of Sonoco and Flexible Packaging

Most of the allegations and evidence concern the flexible packaging division of the Consumer Packaging reportable business segment. Sonoco has four reportable business segments: 1) Consumer Packag-

ing, 2) Tubes and Cores/Paper, 3) Packaging Services, and 4) All Other Sonoco. Sonoco 2006 10–K, p. 3–5 (Doc. # 125–5). Consumer Packaging accounted for 35.7% or $1.3 billion of Sonoco's net sales for 2006. *Id.* at 3. Within the Consumer Packaging segment are the following groups of products: 1) Rigid Packaging—Paper, 2) Rigid Packaging—Plastic, 3) Ends and Closures—Plastic and metal, and 4) Printed Flexible Packaging. *Id.* at 3–4. Defendants assert that around 2007, Sonoco consisted of approximately 18 different business units, of which flexible packaging was one such unit.[1] Mot. Summ. J., p. 5 (Doc. # 108).

For 2006, the five largest customers in Consumer Packaging accounted for approximately 30% of that segment's sales. Sonoco 2006 10–K, p. 6 (Doc. # 125–5). By comparison, for the same period the five largest customers for Packaging Services accounted for approximately 79% of sales in this segment. *Id.* Sonoco's largest customer, Proctor & Gamble, accounted for 12% of the Company's consolidated revenues in 2006. *Id.* No other customer comprised more than 5% of the Company's consolidated revenues in 2006. *Id.*

The consolidated operating profits for Consumer Packaging totaled $109.6 million for 2006. *Id.* at 23. By comparison, consolidated operating profits for Tubes and Cores/Paper for 2006 totaled $148.2 million, Packing Services operating profits totaled $39.2 million, and All Other Sonoco

operating profits totaled $49.1 million. *Id.* Consolidated operating profits for the company as a whole for 2006 was $274.8 million. *Id.*

## B. Flexible Packaging through 2006 and Budgeting for 2007

From 2001 through 2006, flexible packaging experienced an increase in aggregate selling prices across all customers. Long Range Plan Performance Summary for Flexible Packaging, SON–E–00058463–00058465, p. 3. However, Plaintiff alleges in mid–2006, some of Sonoco's customers put out bids on their flexible packaging business. Resp. Mot. Summ. J., p. 7 (Doc. # 125). Plaintiff argues that in order to retain its business with [Redacted], Sonoco had to reduce its prices. *Id.* [Redacted] was flexible packaging's second largest customer in terms of sales dollars. *See* Flexible Packaging—2007 Budget, SON–E–00000202, p. 24. [Redacted] customer sales were [Redacted] in 2005, were projected to be [Redacted] in 2006, and were budgeted to be [Redacted] in 2007. *Id.* An unfavorable change in sales price of approximately [Redacted] due to [Redacted] bid reductions was included in the 2007 budget. SON–E–00000186, p. 8.[2] Plaintiff alleges the [Redacted] price reductions resulted in a [Redacted] in the flexible packaging division's budgeted EBIT for 2007.[3] Pl.'s Resp. Mot. Summ. J., p. 9. (Doc. # 125).

---

1. The Court does not find it necessary to determine whether the flexible packaging "business unit" referenced in Defendants' motion to dismiss is identical to the Printed Flexible Packaging "group of products" referred to in Sonoco's 2006 10–K report. The 2006 10–K report breaks down each reportable business segment into 12 "groups of products" listed in bold. *Id.* at 3–5.

2. A breakdown of the [Redacted] bid reductions by product and the bid reductions' im-

pact on margins can be found at SON–E–00000198, p. 20.

3. "EBIT" generally refers to "earnings before interest and taxes," as the term is defined in Defendants' Motion for Summary Judgment on page 6, However, Defendants also referred to EBIT as "earnings before income taxes," at the hearing. Hr'g Tr. 34:9–10 and 156:15. (Doc. # 146).

Plaintiff contends further that because Sonoco did not sufficiently lower its prices for [Redacted] Sonoco lost [Redacted] flexible packaging business to a competitor. Resp. Mot. Summ. J., p. 7–8. (Doc. # 125). [Redacted] was the third largest customer in terms of sales dollars for flexible packaging for 2005 and was projected to remain so for 2006. SON–E–00000202, p. 24. However, the loss of [Redacted] business from pricing competition resulted in sales attributable to [Redacted] dropping from a projected [Redacted] in 2006 to a budgeted [Redacted] for 2007. *Id.* Sonoco expected the loss of [Redacted] business to result in a [Redacted] reduction in sales dollars and a [Redacted] reduction in EBIT for 2007. *Id.* at 8. Mr. Coker, the president of the flexible packaging division at the time, stated:

> We did budget for reduced [Redacted] volume. We did budget, actually, for increased [Redacted] prices because we told [Redacted] that in the event that we were not awarded the business and that we were phasing out of supply with them, that we would ... have higher prices because it's more expensive to work under that environment.
>
> So [Redacted] volume was significantly lower; and, therefore, profits derived from [Redacted] were significantly lower in 2007 than they were in 2006. [Redacted] volume was run at basically every plant except Waco that Sonoco operated, so that productivity impact was massive across all of—virtually all of our plants.

Coker Dep. 58:13–19 and 59:6–12.

Additionally, Plaintiff argues flexible packaging experienced competitive pricing activity with other customers as well. [Redacted] flexible packaging's largest customer, received a "[Redacted]" for 2007. Coker Dep. at 56:1–15. Price reduction costs related to a bid with [Redacted] was estimated to be around [Redacted] Coker Dep. 54:5–16. Including reductions to the [Redacted] [Redacted] [Redacted] account, budgeted price reductions unrelated to the [Redacted] concessions totaled [Redacted] SON–E–00000186, p. 8.

As a result of the price concessions and lost customer, the flexible packaging division faced a budgeted overall sales price decrease of approximately [Redacted] from 2006 to 2007. *Id. See* Bridge Analysis—EBIT Variance 2007 Plan vs. 2006 reforecast @ 2007 Rates, SON–E–00045714 (email from John Park dated November 4, 2006). Similarly, Plaintiff contends overall sales prices for the consumer packaging segment were budgeted to decrease [Redacted] from 2006 to 2007. *Id.*

Defendants have presented evidence that the concessions, price deductions, and lost volume sales were all included in Sonoco's flexible packaging budget for 2007. SON–E–00000186, p. 8–10. For flexible packaging in 2007, Sonoco budgeted for EBIT to be [Redacted] a [Redacted] increase to EBIT over the 2006 projection. *Id.* at 7–8. The concessions, deductions, and sales losses reduced the budgeted EBIT by [Redacted].[4]

Sonoco budgeted for [Redacted] in manufacturing and capital productivity improvements. SON–E–00000186, p. 8. The same document later noted the productivity objective for 2006 was [Redacted], the productivity forecast for 2006 was [Redacted] and the productivity objective for 2007 was [Redacted] SON–E–00000214, p. 36. The "2007 Operating Plan" notes under the subheading "Summary of Productivity by VP 2007 Plan" that flexible packaging budgeted for a productivity improvement

---

4. Sonoco anticipated earnings before interest and taxes to be [Redacted] for 2007. SON–E–00051248 (Doc. # 108–8). For 2007, Sonoco reported earnings before interest and taxes of $307.9 million. Ex. L, Mot. Summ. J., (Doc. # 108–13).

of [Redacted] of total cost. SON–E–00051248. The company as a whole budgeted for a [Redacted] improvement. *Id.*

## C. Sonoco Public Announcements and Press Releases

On February 7, 2007, Sonoco issued a press release announcing its financial results for the fourth quarter and year end of 2006. Ex. E, Mot. Summ. J. (Doc. # 108–6). The class period begins on this date. Among other things, the press release stated, "Base operating profit increased year over year as strong productivity and increased selling prices more than offset higher costs of labor, material, energy and freight; slightly lower volumes; and an unfavorable shift in the mix of business." *Id.* at 1. The company noted further:

2006 was a strong year for Sonoco. We achieved record sales, net income, and cash flow from operations. We produced a third consecutive year of operating margin improvement driven by strong productivity gains and a continued focus on price management, cost reductions, and the turnaround of underperforming operations.

*Id.* at 2.

Under the heading "First Quarter 2007 Outlook," the press release stated the "upcoming quarter and annual forecasts are given assuming no significant change in companywide volumes and/or prices due to a change in general economic conditions." *Id.* It also reflected that Sonoco expected "first quarter 2007 base earnings to be in the range of $.47 to $.50 per diluted share." *Id.* Additionally, Sonoco noted, "[T]he Company expects full-year 2007 base earnings per diluted share to be in the range of $2.28 to $2.31." *Id.* Finally, in discussing the Consumer Packaging segment, the press release stated:

The Consumer Packaging segment's 2006 fourth quarter sales increased as a result of higher selling prices, the favorable impact of foreign currency translation and acquisitions. Sales were negatively impacted by lower volumes in rigid paper containers in North America and in metal ends and closures. Domestic operations were able to offset volume shortfalls and an unfavorable shift in the mix of business with price increases, cost management and productivity improvements.

*Id.*

Under the heading "Forward-looking Statements," Sonoco explained that statements found within the press release that were not historical in nature were intended to be "forward-looking statements." *Id.* at 4. The press release noted forward-looking statements included statements regarding "improved productivity and cost containment," and that they were "based on current expectations, estimates and projections about our industry, management's beliefs and assumptions made by management." *Id.* Further, it explained this included information about "guidance and other estimates," and "are not guarantees of future performance and are subject to risks, uncertainties and assumptions that are difficult to predict." *Id.* The press release then listed several of these risks, including the possibility the company is unable to maintain or increase productivity levels and risks related to pricing pressures. *Id.*

On February 28, 2007, Sonoco filed its annual report with the SEC for the fiscal year ended December 31, 2006. Sonoco 10–K 2006, (Doc. # 125–5). The report reaffirmed the financial results announced at the February 7, 2007 press release. Additionally, the report included similar disclaimer language related forward-looking statements. Neither the press release nor the 2006 annual report included information regarding the price concessions

provided in the flexible packaging division of Consumer Packaging, which would go into effect on January 1, 2007.

Sonoco issued another press release on April 20, 2007, which announced first quarter results for 2007. Ex. F, Mot. Summ. J. (Doc. # 108–7). The company reported first quarter 2007 earnings of $.52 per share. *Id.* Among other things, the press release stated that "net sales for the first quarter of 2007 were $956 million, a 17% increase over the $819 million posted in the same period of 2006." *Id.* at 2. The company noted half the increase resulted from an increase in the number of days in the fiscal first quarter of 2007 compared to 2006. *Id.* Mr. DeLoach stated, "In addition, we are pleased to be able to recover much of the materials and other cost increases experienced during the quarter through higher selling prices." *Id.* Mr. DeLoach noted further, "Through manufacturing productivity improvements and attention to cost management, we were able to successfully navigate our way through what was a volatile first-quarter environment." *Id.*

Under the heading "Second quarter Outlook," the press release explained that base earnings were above Sonoco's previously announced guidance. *Id.* at 3. Mr. DeLoach then stated:

> Sonoco expects second quarter 2007 base earnings to be in the range of $.55 to $.58 per diluted share, assuming no significant change in Companywide volumes and/or prices or a change in general economic conditions. As a result, the Company expects full-year 2007 base earnings per diluted share to be in the range of $2.36 to $2.40 per share.
> *Id.*

The press release noted Sonoco's previous base earnings guidance for 2007 was between $2.28 and $2.31 per share. *Id.*

Under "Segment Review," the press released discussed Consumer Packaging.

*Id.* It reported first quarter 2007 sales increased to $ 333 million. *Id.* Sonoco also noted sales were higher for the first quarter not only because of the longer quarter, but also as a result of "sales from acquisitions, higher selling prices, and favorable foreign currency rates." *Id.* Finally, the press release explained that several factors contributed to the year-over-year operating profit increase for the quarter, including "savings from productivity." *Id.*

As with previous releases, this press release included disclaimers regarding "forward-looking statements" similar to the language previously quoted. The quarterly report for the first quarter of 2007, ending April 1, 2007, was filed with the SEC on May 1, 2007. Sonoco 10–Q, First Quarter 2007. (Doc. # 125–11). Neither the press release nor the first quarter report included information regarding price concessions in the flexible packaging division of Consumer Packaging, which went into effect on January 1, 2007.

Prior to the start of the July 20, 2007 trading day, Sonoco issued its second quarter 2007 earnings results. Ex. B, Mot. Summ. J. (Doc. # 108–3). Sonoco "reported second quarter 2007 earnings of $.41 per diluted share, a 16 percent decrease from second quarter 2006 earnings of $.49 per diluted share." *Id.* at 2. However, Sonoco stated base earnings for the second quarter increased compared to the same period in 2006. *Id.* At $994 million, net sales were 8% higher for the second quarter of 2007 compared to 2006. *Id.* Sonoco attributed the increase to acquisitions and "higher selling prices implemented to offset higher raw materials and other costs ..." but explained that this was "offset by volume declines in our Tube and Cores/Paper and Consumer Packaging segments." *Id.*

As for the outlook of the third quarter, Mr. DeLoach stated, "We expect third quarter 2007 base earnings to be in the range of $.62 to $.65 per diluted share, assuming no significant change in general economic conditions. Our expectation for full-year 2007 base earnings per diluted share is unchanged at $2.36 to $2.40 per diluted share." *Id.* at 3. The press release stated the guidance "assumes reduced profitability in the Consumer Packaging segment, principally in flexible packaging operations, and lower results in the Packaging Services segment related to the outcome of recent bidding activity." *Id.*

Finally, the company discussed the Consumer Packaging segment. Sonoco reported that Consumer Packaging realized a 6 percent increase in second quarter 2007 sales, up from $328 million in the second quarter of 2006 to $349 million. *Id.* Sonoco reported a drop in base operating profit from $26.3 million in 2006 to $22.5 million in 2007. *Id.* Additionally, the press release reported:

> Sales in the Consumer Packaging segment were up year-over-year in the second quarter due primarily to acquisitions and the favorable impact of foreign currency translation, partially offset by volume declines in rigid paper containers and flexible packaging. Despite the benefit of the overall increase in sales, base operating profit declined due to the lower volumes, price reductions in certain flexible packaging without offsetting reductions in costs, an unfavorable change in the mix of business, along with rising labor and other costs. Productivity for the segment, while favorable, was negatively impacted by operational issues in flexible packaging.

*Id.* at 3–4.

On September 18, 2007, Sonoco announced it expected third quarter 2007 base earnings to be between $.55 and $.58 per diluted share, down from the previous guidance of $.62 and $.65 per diluted share. Ex. C, Resp. Mot. to Excl., p. 2 (Doc. # 110–3). Mr. DeLoach attributed the results to "a greater than expected decline in volumes across most of our served markets as a result of weaker market conditions." *Id.* The company revised base earnings for the full year of 2007 from $2.36 to $2.40 down to $2.23 to $2.26 per diluted share. *Id.* Again, at the beginning of 2007, Sonoco forecasted earnings to be in the range of $2.28 to $2.31 per diluted share. This date marks the end of the Class Period.

On October 19, 2007, Sonoco released its third quarter 2007 results. Ex. K, Mot. Summ. J. (Doc. # 108–12). Sonoco reported third quarter 2007 earnings of $.63 per diluted share compared to $.60 for the previous year. *Id.* at 2. Also, base earnings were $.64 per diluted share compared to $.61 for the same period in 2006. *Id.* Mr. DeLoach stated, "Third quarter base earnings exceeded the high end of our revised guidance due to the lower than expected effective tax rate." *Id.* Additionally, Mr. DeLoach stated, "Results from operations were in line with our revised projections and reflected slightly lower year-over-year volumes stemming from slowing activity in most of our served markets and higher raw material and other costs." *Id.* Finally, Mr. DeLoach explained that while he remained cautious about the remainder of 2007, because of actions taken to improve operations and streamline costs, the company was "raising our full-year guidance to $2.28 to $2.31 to reflect the favorable effect of the third quarter tax adjustments and expect fourth quarter base earnings to be in the range of $.52 to $.55 per diluted share."

Finally, it is worth highlighting a few points from Sonoco's February 6, 2008 press release. Ex. L, Mot. Summ. J. (Doc. # 108–13). Sonoco reported fourth quar-

ter 2007 earnings of $.54 per diluted share compared to $.39 per diluted share in 2006, and base earnings of $.62 per diluted share, compared to $.56 per diluted share in 2006. *Id.* at 2. Mr. DeLoach attributed the improvement primarily to a lower effective tax rate. *Id.* For the year of 2007, Mr. DeLoach stated, "Company-wide productivity gains, income from acquisitions and the favorable impact of a lower effective tax rate led to a year-over-year improvement in base earnings." *Id.* at 3. Sonoco reported base earnings of $2.38 per diluted share for 2007. *Id.*

### D. Consumer Packaging and Flexible Packaging Performance in 2007

For the first quarter of 2007, EBIT was [Redacted] compared to [Redacted] in 2006 for flexible packaging. Financial Review 1st Quarter 2007, Flexible Packaging, SON–E–000007011. Net sales rose from [Redacted] in the first quarter of 2006 to [Redacted] in 2007. *Id.* The company also noted trade selling price changes led to a revenue reduction of [Redacted] due primarily to the price concessions and deductions previously discussed. *Id.* Additionally, Sonoco reported manufacturing productivity was [Redacted] [Redacted] flexible packaging.[5] *Id.*

Specifically for the month of March 2007, Plaintiff notes overall selling prices in the flexible packaging division were [Redacted] [Redacted] than in March 2006. SON–E–00016687. Overall selling prices in Consumer Packaging for March 2007 were [Redacted] lower than in March 2006. *Id.* Similarly, overall selling prices in Consumer Packaging were [Redacted] lower in July 2007 compared to July 2006. SON–E–00015746.

Plaintiff also references Sonoco's bridge analysis of 2007 for the month of May.

SON–E–00022915. This document reveals that, for the month of May, the flexible packaging division recorded a sales price decline of [Redacted] and a negative EBIT of [Redacted] *Id.* For Consumer Packaging, sales price increased [Redacted] and EBIT was [Redacted]. *Id.*

Plaintiff notes that on May 14, 2007, Mr. DeLoach requested certain information concerning Sonoco's flexible packaging division. SON–E–000009585. This report revealed that actual sales were [Redacted] below budgeted sales. *Id.* Actual EBIT was [Redacted] below budgeted EBIT. *Id.*

For the second quarter of 2007, Sonoco's net sales in flexible packaging were [Redacted] compared to [Redacted] in 2006, and EBIT was [Redacted] compared to [Redacted] in 2006. Financial Review 2nd Quarter 2007, Flexible Packaging, SON–E–000001205. The company experienced a revenue reduction of [Redacted] quarter over quarter due to trade selling price changes. *Id.* Manufacturing productivity was [Redacted] unfavorable for the quarter. *Id.*

### PROCEDURAL HISTORY

Plaintiff originally filed this action on June 26, 2008. (Doc. # 1). Plaintiff filed an amended class action complaint on October 14, 2008. (Doc. # 27). Defendants filed a motion to dismiss on November 5, 2008. (Doc. # 30). The Court conducted a hearing on the matter on July 31, 2009. Subsequently, the Court entered an order denying the motion to dismiss. (Doc. # 52). Defendants filed a motion for reconsideration, (Doc. # 54), which was denied by Order on November 10, 2009. (Doc. # 61).

Following the Court's ruling on the motion for reconsideration, Plaintiff filed a

---

**5.** The report indicates that a [Redacted] excluding this issue, manufacturing productivity would have been [Redacted] In total, Sonoco [Redacted] SON–E–000007015.

motion for class certification on November 16, 2009. (Doc. # 63). This Court held a hearing on the motion to certify on May 17, 2010. On September 30, 2010, this Court entered an Order granting the motion for class certification. (Doc. # 92). The class was certified for those purchasers of Sonoco's common stock between February 7, 2007 and September 18, 2007. Then, pursuant to Rule 23(f) of the Federal Rules of Civil Procedure, Defendants sought permission from the Fourth Circuit to appeal from the order granting class certification. The Fourth Circuit denied Defendants' petition. (Doc. # 99).

Defendants filed a motion to exclude the opinions and testimony plaintiff's expert, John D. Finnerty, Ph.D., on January 31, 2011. (Doc. # 105). Defendants then filed a motion for summary judgment on February 11, 2011. (Doc. # 108). On February 14, 2011, Plaintiff filed a motion to exclude the testimony of John P. Freeman. (Doc. # 109). The same date Plaintiff filed a response in opposition to Defendants' motion to exclude and a cross-motion to exclude the testimony of Defendants' expert Christopher F. Noe, Ph.D. (Doc. # 110). Defendants filed a reply in support of its motion to exclude Dr. Finnerty's testimony on February 24, 2011. (Doc. # 117). Additionally, Defendants filed responses to Plaintiff's motions to exclude the testimony of Freeman and Dr. Noe on March 10, 2011. (Docs. # 121 and 122). A response in opposition to the motion for summary judgment was filed by Plaintiff on March 11, 2011. (Doc. # 125). On March 28, 2011, Plaintiff filed replies in support of its motions to exclude. (Docs. # 127 and 128). Finally, Defendants filed a reply in support of the motion for summary judgment on April 1, 2011. (Doc. # 134).

This Court held a hearing on the abovementioned motions on June 13, 2011. Both parties have since filed supplemental authority and replies thereto. (Docs.

# 150, 151, 152, 153, 154). The Court has considered all filings, arguments, memoranda, and evidence submitted by the parties. These matters are now ripe for disposition.

## DISCUSSION

### I. Defendants' Motion to Exclude Opinions and Testimony of John D. Finnerty, Ph.D.

■ Defendants seek to have Dr. Finnerty's opinions on loss causation and damages excluded pursuant to Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Defendants argue Dr. Finnerty did not conduct the requisite analysis to identify the cause of the losses or damages alleged. Additionally, Defendants argue his loss causation opinion is unreliable and inadmissible. Loss causation and economic loss are both elements of a Rule 10b–5 cause of action. *See Matrixx Initiatives, Inc. v. Siracusano,* —— U.S. ——, 131 S.Ct. 1309, 1317–1318, 179 L.Ed.2d 398 (2011). Loss causation is a "causal connection between the material misrepresentation and the loss." *Teacher's Retirement System of La. v. Hunter,* 477 F.3d 162, 173 n. 2 (4th Cir.2007) (citing *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)).

■ In the Fourth Circuit, the "proponent of the [expert] testimony must establish its admissibility by a preponderance of proof." *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert,* 509 U.S. at 592, n. 10, 113 S.Ct. 2786); *see also* Fed.R.Evid. 104(a). A "court must recognize that due to the difficulty in evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.' " *Westberry v. Gislaved Gummi*

*AB*, 178 F.3d 257, 261 (4th Cir.1999) (quoting *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786). "And, given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *Westberry*, 178 F.3d at 261 (citing *United States v. Dorsey*, 45 F.3d 809, 815–16 (4th Cir.1995)).

Federal Rule of Evidence 702 provides: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Advisory Committee Notes to Rule 702 make clear that "[s]ubpart (1) of Rule 702 calls for a quantitative rather than a qualitative analysis. The amendment thus requires that expert testimony be based on sufficient underlying 'facts or data.'"

■ *Daubert* assigns the trial judge with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." 509 U.S. at 597, 113 S.Ct. 2786. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) expanded the trial judge's "gatekeeping" function from scientific evidence to all expert testimony. 526 U.S. at 141, 119 S.Ct. 1167. In determining whether expert testimony is relevant and reliable, this Court must determine whether the testimony is based "solely on principles and methodology, and not on the conclusions

they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786.

■ Thus, in assessing expert testimony, this Court first examines "whether the reasoning or methodology underlying the expert's proffered opinion is reliable— that is, whether it is supported by adequate validation to render it trustworthy." *Bourne v. E.I. DuPont de Nemours & Co.*, 85 Fed.Appx. 964, 967 (4th Cir.2004). The Court next examines "whether the opinion is relevant to the facts at issue. . . . The focus of the second prong has, thus, been described as 'fit.'" *Id.* When determining reliability, "the court has broad latitude to consider whatever factors on validity that the court finds to be useful; the particular factors will, however, depend upon the unique circumstances of the expert testimony involved." *Id.* at 967. (citing *Kumho Tire Co.*, 526 U.S. at 149–50, 119 S.Ct. 1167). The Fourth Circuit has noted:

In attempting to delineate the inquiry required by Rule 702, the Supreme Court set forth a non-exclusive list of factors to consider in making the first determination of whether proffered testimony was sufficiently reliable to constitute scientific knowledge: (1) whether the theory or technique has been or could be tested; (2) whether the technique has been subject to peer review and publication; (3) the known or potential rate of error; and (4) the "general acceptance" of the technique by the relevant scientific community.

*Ruffin v. Shaw Indus., Inc.*, 149 F.3d 294, 296 (4th Cir.1998) (citing *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786).

The testimony offered by Dr. Finnerty is subject to the tests outlined above. Dr. Finnerty offers expert testimony related to loss causation and damages. The Fourth Circuit has held, "[E]stablishing loss sufficient to prove liability ('loss causa-

tion') does not require a plaintiff to prove that the defendant's fraud was the *sole* cause of the plaintiff's loss." *Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 232 (4th Cir.2004) (citing *Semerenko v. Cendant Corp.*, 223 F.3d 165, 186–87 (3rd Cir.2000)). Instead, "[A] plaintiff need only prove that defendant's misrepresentation was a *substantial* cause of the loss by showing '[a] direct or proximate relationship between the loss and the misrepresentation.'" *Id.* (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 360 (4th Cir.1996)). However, "recovering out-of-pocket damages based on the market price of a security ... 'require[s] elimination of that portion of the price decline that is the result of forces unrelated to the wrong.'" *Miller*, 364 F.3d at 232. (quoting *In re Exec. Telecard, Ltd. Sec. Litig.*, 979 F.Supp. 1021, 1025 (S.D.N.Y.1997)). This is to "limit recovery to 'actual damages on account of the act complained of.'" *Id.* (quoting 15 U.S.C. § 78bb(a)).

Plaintiff has submitted Dr. Finnerty's Declaration and Rebuttal Declaration. Plaintiff alleges Dr. Finnerty conducted an "event study" to account for the decrease in stock price drop that could be caused by non-fraud related negative news disseminated with the corrective disclosure. Finnerty Report ¶¶ 11–101. Plaintiff asserts an event study is the generally accepted analytical tool for analyzing loss causation. *See In re Apollo Grp. Inc. Sec. Litig.*, 509 F.Supp.2d 837, 844 (D.Ariz.2007) ("An event study is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price."). "For securities-fraud purposes, the 'event' analyzed is the disclosure of the alleged fraud to the market." *Id.*

The Court finds the reports submitted by Dr. Finnerty are sufficiently reliable at this stage of the proceedings based on the evidence now before the Court to permit the opinions and testimony of Dr. Finnerty to be submitted to the jury. Dr. Finnerty provides detailed analysis and explanation of how he determined that Defendants' alleged misrepresentations were a substantial cause of Sonoco's stock price drops on July 20, 2007 and September 18, 2007. Moreover, Dr. Finnerty explains how he determined what portion of the price decline was the result of Defendants' alleged misrepresentations. The reports apparently account for market and industry factors that may have contributed to Sonoco's stock price drop on July 20, 2007 and September 18, 2007. Additionally, he has analyzed many, if not all, of the news events released on these two dates. The Court also finds Dr. Finnerty's testimony, that on these two dates Sonoco's stock experienced abnormal returns, at this stage of the proceedings, to be sufficiently reliable. After reviewing Dr. Finnerty's reports, the Court concludes the quantitative analysis on the impact of the isolated negative information found in the press releases, in light of the evidence of record, comports with the requirement that testimony be both sufficiently reliable and relevant as set forth in *Daubert*. Accordingly, the Court denies Defendants' motion to exclude the opinions and testimony of Dr. Finnerty at this stage of the proceedings.

## II. Plaintiff's Motion to Exclude Opinions and Testimony of Christopher F. Noe, Ph.D.

■ Plaintiff argues Dr. Noe lacks the requisite knowledge and qualifications to offer his opinions on loss causation or damages. Plaintiff asserts Dr. Noe has not previously testified on issues of loss causation. Plaintiff also argues Dr. Noe did not perform an event study or other meaningful analysis. Plaintiff argues Dr. Noe's opinion that the market was aware of the price concessions and lost customers is false.

The Court finds Dr. Noe's expert testimony to be both reliable and relevant under *Daubert* at this stage of the proceedings. Defendants assert Dr. Noe takes the position that the price reductions and lost customer were accounted for in Sonoco's earnings guidance, which was published at the beginning of the Class Period. Dr. Noe asserts this information therefore was not new information released to market on July 20, 2007 or September 18, 2007. Dr. Noe concludes that the price reductions and lost customer could not have caused the stock price declines because this information was not new information. Because Dr. Noe's testimony is that the price concessions and lost customer were not new information disseminated to market, it is not fatal to his testimony that he did not conduct an event study. Dr. Noe apparently asserts that there was no "event," so there is no need for an event study.

The Court also concludes Dr. Noe is qualified at this stage of the proceedings to provide testimony on the subjects of loss causation and damages. Dr. Noe has a Ph.D. in accounting and a master's degree in economics, he has worked with an economics consulting firm for ten years, he has previously worked on loss causation analysis, and he has authored articles related to stock price analysis. Accordingly, the Court denies Plaintiff's motion to exclude Dr. Noe's opinions and testimony, at this stage of the proceedings.

## III. Plaintiff's Motion to Exclude Opinions and Testimony of John P. Freeman

Plaintiff contends Defendants have offered impermissible legal opinions of John P. Freeman as expert testimony. Plaintiff alleges Mr. Freeman has provided testimony that Plaintiff has failed to meet its burden of proof, that Defendants did not violate Rule 10b–5, that Defendants did not omit material facts, that Defendants acted in good faith, that Sonoco's financial projections are protected under the safe harbor provision, that certain cautionary language included with Sonoco's filings was meaningful, and that Defendants acted sincerely and honestly. Plaintiff also contends Freeman's analysis is not predicated on scientifically sound or reliable methodologies.

The Fourth Circuit Court of Appeals has stated that "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver*, 470 F.3d 550, 562 (4th Cir.2006). "To determine when a question posed to an expert witness calls for an improper legal conclusion, the district court should consider first whether the question tracks the language of the legal principle at issue or of the applicable statute, and second, whether any terms employed have specialized legal meaning." *United States v. Barile*, 286 F.3d 749, 760 (4th Cir.2002). Plaintiff asserts Defendants have offered what Freeman believes to be relevant caselaw as well as his interpretation of the governing statutes.

This Court holds that it will not exclude the testimony and opinions of Mr. Freeman at this stage of the proceedings. However, to the extent Mr. Freeman or other experts offer testimony which constitutes impermissible legal conclusions at trial, the Court will carefully consider whether these opinions invade the province of the jury and should not be admitted. Therefore, Defendants motion to exclude the opinions and testimony of John P. Freeman is denied at this stage.

## IV. Defendants' Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment if the pleadings, responses to

discovery, and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the initial responsibility of informing this Court of the basis for its motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This requires the movant to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *see also Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

Though the moving party bears this initial responsibility, the nonmoving party must then produce specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 334, 106 S.Ct. 2548. In satisfying this burden, the nonmoving party must offer more than a mere "scintilla of evidence" that a genuine issue of material fact exists, *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505, or that there is "some metaphysical doubt" as to material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, it must produce evidence on which a jury could reasonably find in its favor. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

In considering the motion for summary judgment, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Miltier v. Beorn*, 896 F.2d 848 (4th Cir.1990). Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (1986) (internal quotations omitted).

■ Plaintiff has alleged that Defendants violated § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. To prevail on a securities fraud under these provisions, a plaintiff "must prove '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano*, —— U.S. ——, 131 S.Ct. 1309, 1317–18, 179 L.Ed.2d 398 (2011) (citing *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008)). Defendants challenge Plaintiff's ability to establish that Defendants made a material misrepresentation or omission, scienter, loss causation, and damages. Each of these elements is discussed in turn.

## A. Material Misrepresentation or Omission

Defendants put forth several arguments as to why Plaintiff has failed to prove there is a genuine issue of material fact concerning the first element of a securities fraud claim. First, Defendants argue that virtually all of the statements alleged in the Amended Complaint are forward-looking and therefore not actionable under the Safe Harbor of the Reform Act. Second, Defendants contend the statements that arguably are ineligible for immunity under the Safe Harbor provision are in fact true statements. Third, Defendants challenge

the materiality of the alleged misrepresentations or omissions. Fourth, Defendants argue there is no duty to disclose the allegedly omitted information.

### i Forward–Looking Statements and the Safe Harbor

█ Forward-looking statements are immune from liability under the Safe Harbor of the Reform Act if certain conditions are met. 15 U.S.C. § 78u–5. The Safe Harbor provision reads:

(c)(1) [I]n any private action arising under this chapter that is based on an untrue statement of material fact or omission of a material fact necessary to make the statement not misleading, [the defendant] shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—

(A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was—

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u–5.

Defendants argue the earnings forecasts alleged in paragraphs 42–45, 51–53, 60–63, and 71 of the Amended Complaint are predictions of future revenue or earnings that are forward-looking and protected by the Safe Harbor provisions. *See In re CIENA Corp. Sec. Litig.*, 99 F.Supp.2d 650, 661 (D.Md.2000) (holding that the statements cited by the plaintiff involved predictions made by CIENA of its future revenue and earnings which were forward-looking statements protected by the Safe Harbor provision).

In the Safe Harbor provision, "forward-looking statement" is defined to include "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u–5(i)(1)(A). Furthermore, "any statement of the assumptions underlying or relating to any statement described in subparagraph (A)" is also included in the definition of "forward-looking statement." 15 U.S.C. § 78u–5(i)(1)(D). The aforementioned paragraphs of the Amended Complaint address first quarter 2007 earnings per share predictions, full-year 2007 earnings per share guidance, expected EBIT margins for 2007, and an increase in earnings projections for 2007.

After a review of the Amended Complaint, it is evident that the subject matter contained within paragraphs 42–45, 51–53, 60–63, and 71 falls under the definition of a "forward-looking statement" found within the Safe Harbor provision. These paragraphs clearly refer to projections of "revenue," "earnings per share," and "other financial items." Moreover, these statements were identified as forward-looking when made. For example, the February 7, 2007 press release noted under the heading "Forward–Looking Statements" that "statements not historical in nature,

are intended to be, and are hereby identified as 'forward-looking statements' for purposes of the safe harbor...." Ex. E, Mot. Summ. J. (Doc. # 108–6). When addressing the first quarter 2007 outlook, the press release states what the company "expects" earnings to be. *Id.* The press release notes further that the word "expect" and "similar expressions identify forward-looking statements." *Id.* Similar language is present in the other press releases, public announcements, and SEC filings. *See* Exs. B, C, F, K, L, and P, Mot. Summ. J. (Doc. # 108); Ex. C, Resp. Mot. to Excl. (Doc. # 110–3).

The Safe Harbor provision requires forward-looking statements to be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i). To be meaningful, cautionary language must "convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business." H.R. Conf. Rep. No. 104–369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, at 742; *See also In re Lab. Corp. of Am. Holdings Sec. Litig.,* 2006 WL 1367428, at *5 (M.D.N.C. May 18, 2006). This Court notes further that "the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions ... which the plaintiffs challenge." *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1120 (10th Cir.1997). (citing *In re Donald Trump Casino Sec. Litig.,* 7 F.3d 357, 371 (3rd Cir.1993)); *See also Gasner v. Board of Supervisors of the Cnty. Of Dinwiddie, Va.,* 103 F.3d 351, 359 (4th Cir.1996). However, "As long as the firm reveals the principal risks, the fact that some other event caused problems cannot be dispositive." *Asher v. Baxter Int'l. Inc.,* 377 F.3d 727, 730 (7th Cir.2004).

*See also Miller v. Champion Enterprises, Inc.,* 346 F.3d 660, 678 (6th Cir.2003) ("[Defendant] is not required to detail every facet or extent of that risk to have adequately disclosed the nature of the risk.")

Plaintiff contends Defendants do not gain the benefit of the safe harbor provision because it does not apply to statements of current or historical fact. Additionally, Plaintiff alleges that (1) the forward-looking statements lacked sufficient cautionary language, and (2) Defendants' representations were knowingly false when made. Moreover, Plaintiff contends the cautionary language included with the public statements is "vague and boilerplate." Resp. Mot. Summ. J., p. 30 (Doc. # 125). Plaintiff also argues the earnings projections are actionable because they were supported by specific statements of fact. Finally, Plaintiff alleges that Defendants had "actual knowledge" that the price concessions and lost business was affecting its projections, and because these issues were "known to Defendants prior to the Class Period, they could not be characterized as *potential* risks ...." *Id.*

The press releases and public statements include language noting that forward-looking statements are "not guarantees of future performance and are subject to risks, uncertainties and assumptions that are difficult to predict." *See* Ex. E, Mot. Summ. J., p. 4 (Doc. # 108–6). The company notes these risks include those related to "availability and pricing of raw materials," "ability to maintain or increase productivity levels and contain or reduce costs," "market conditions," "ability to maintain market share," and "pricing pressures and demand for products." *Id.* During the class period the company was negatively impacted by several of the noted risks. *See* Ex. B, Mot. Summ. J. (Doc.

# 108–3) (noting that the company experienced "lower than expected volumes and a challenging operating environment due to high raw materials and other costs.").

Plaintiff alleges the "Risk Factors" provided with Sonoco's public statements do not adequately warn investors of "hidden price concessions, losses of key customers, or the decline in overall pricing in the Consumer Packaging segment." Resp. Mot. Summ. J., p. 30 (Doc. # 125). In support, Plaintiff cites to *In re Nash Finch Co. Sec. Litig.*, 502 F.Supp.2d 861 (D.Minn. 2007). In *Nash*, after the court listed the statements it deemed forward-looking, it noted the forward-looking statements were accompanied by cautionary language that was not boilerplate. *Id.* at 873. However, the court concluded that "cautionary language cannot be 'meaningful' when defendants know that the potential risks they have identified have in fact already occurred and that the positive statements they are making are false." *Id.* Moreover, the court stated, "[I]f Defendants knew that the specific risks and uncertainties stated to be 'potential' in their cautionary language had already been realized, and that their forward-looking statements were false or misleading, then their forward-looking statements are not protected by the safe harbor." *Id.*

This Court finds the arguments put forth by Plaintiff sufficiently persuasive. Plaintiff has presented evidence that Defendants knew of the price concessions and lost customer. While this information may have been factored into the earnings guidance, it was not disclosed to the public. Additionally, there is a question of fact concerning whether Defendants knew the "potential" risks identified had already occurred. Accordingly, the Court finds there is a question of fact concerning whether the cautionary language accompanying Sonoco's forward-looking projections was meaningful. *See Lefkoe v. Jos. A.*

*Bank Clothiers*, 2007 WL 6890353, at n. 10, 2007 U.S. Dist. LEXIS 98777, at n. 10 (D.Md. Sept. 10, 2007) ("[T]he adequacy of cautionary language is a question of fact . . . ."). This is a matter for a jury to decide.

In addition, this Court holds that, with regards to earnings guidance, there is a question of fact concerning whether Defendants' representations were knowingly false when made. 15 U.S.C. § 78u–5(c) makes clear that any private action based on an untrue statement or omission brought against either a natural person or a business entity must fail with respect to any forward-looking statement where "the plaintiff fails to prove that the forward-looking statement . . . was made with actual knowledge by that [person or officer] that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B)(i) and (ii).

Plaintiff argues that the [Redacted] in manufacturing and capital productivity budgeted by the flexible packaging division was "astounding" and "patently unrealistic and unattainable." Resp. Mot. Summ. J., p. 13 (Doc. # 125). Plaintiff points out that at Mr. DeLoach's deposition, he was asked if "Sonoco targets [Redacted] productivity improvement on a year-to-year basis," to which he responded, "That is basically my mandate going into the budgets and we basically negotiate that through the budgeting process." DeLoach Dep. 41:4–9. Further, Mr. DeLoach was asked whether the budget and productivity improvements in flexibles for 2007 was greater than [Redacted], to which he replied, "More than [Redacted]? That would be an awfully high number, I doubt it was." DeLoach Dep. 43:13–19. Plaintiff then states that "the flexible packaging division budgeted a total increase in productivity of [Redacted] in 2007, an over [Redacted] improvement that was more

than three times the benchmark established by DeLoach." Resp. Mot. Summ. J. pp., 13–14 (Doc. # 125); SON–E–00000214, p. 36.

Plaintiff also directs the Court's attention to the email correspondence and the handwritten notes of Mr. DeLoach. On December 20, 2006, a flexible packaging division plant manager sent an email posing several questions he had about the new budget proposal. The manager concluded the email by stating, "The 2007 budget was [Redacted] SON–E–00039746. At a meeting on March 19, 2007, Mr. DeLoach included in his notes that it "appears that we are [Redacted]." SON–E–000010949. Also, at a meeting on April 16, 2007, Mr. DeLoach included in his notes that productivity "is [Redacted]" SON–E–000010273. Mr. DeLoach then wrote that the "problem is the [Redacted]" *Id.*

Plaintiff also alleges that productivity, while not a guarantee, was used to offset guaranteed price reductions and volume loss. *Id.* Finally, Plaintiff argues that the budgeted productivity improvements were unrealistic in light of the predictable negative impact of the loss of the [Redacted] account. *Id.*

The Court finds Plaintiff's position sufficiently persuasive. Plaintiff has put forth evidence that the productivity estimates were much higher than in previous years, even in light of the allegedly predictable negative impact of the loss of the [Redacted] account. Additionally, Plaintiff has put forth evidence in the form of Mr. DeLoach's notes and other emails that the estimates were high, at least one manager had "significant concerns" with the forecast, and that Mr. DeLoach was aware of the problems with productivity. Moreover, Plaintiff has pointed out that the company used productivity estimates which are not certain, to offset known price reductions and volume loss. Considering the evidence in the light most favor-

able Plaintiff, the Court finds this evidence sufficient to generate a question of fact concerning whether the earnings guidance were knowingly false, as Plaintiff asserts, when made. This Court is not making a finding that the statements were false. Whether the cautionary language at issue was meaningful and whether the statements made by Defendants were false and misleading are issues of fact for the jury to decide, in light of the standards that apply at summary judgment.

### ii. Materiality

■ This Court touched on the issue of materiality in both the order on the motion to dismiss and the order on the motion for class certification. (Docs. # 52 and 92). Defendants now assert there is no genuine issue of material fact that the price concessions and lost customer were not material as a matter of law.

■ In order for a statement or omission to be considered material, there must be "a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343 (4th Cir.2003) (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir.1999)). Courts have noted that the "determination of materiality is a mixed question of law and fact that generally should be presented to a jury," and that "[o]nly if no reasonable juror could determine that the [alleged statements] would have 'assumed actual significance in the deliberations of the reasonable [investor]' should materiality be determined as a matter of law." *In re Datastream Systems, Inc. Sec. Litig.*, 2000 WL 33176025 at *2 (D.S.C.2000) (unpub-

lished) (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)).

The arguments put forth by Defendants are similar to those asserted by Defendants in their motion to dismiss and motion for class certification. In the previous order, this Court stated:

"The record reflects that on July 20, 2007, representatives of the defendant company disclosed that the company had given prior price concessions to a major customer. On the date of the disclosure of these concessions, shares in the defendant corporation declined in price." (Doc. # 52). Additionally, the record reflects at least one analyst inquired about the price concessions. At the Sonoco Products Company Second Quarter 2007 Earnings Conference Call an analyst for Wachovia asked, "In your press release you talked about some price reductions in certain flexible packaging and I'm not sure if you mentioned that on the call, but could you give us more color on that please." (Doc. # 68–9, Tr. of Sonoco's July 20, 2007, conf. Call at 5). In response, the CEO stated that "last year, I guess in probably the third or fourth quarter on a contract with one of our major customers there were price reductions given. They were baked into our guidance." *Id.* Similarly, an equity research report published by Wachovia Capital Markets, LLC on July 20, 2007 noted that Sonoco for the second quarter of 2007 reported that their diluted earnings per share were $0.56, or $0.03 below consensus. (Doc. # 71–2, Analyst Report). Further, the publication stated, "Most of the shortfall seems to be due to operational issues in its flexible packaging business (small but growing), in addition to some undercutting on price (negative for BMS/SEE) in flexible packaging (very unlike Sonoco)." *Id.* The fact that an analyst attributed the shortfall in earnings per share partially to undercutting on price in flexible packaging sufficiently establishes at this stage that a reasonable purchaser or seller of a security would consider the fact important in deciding whether to buy or sell the security. Additionally, the fact that the analyst notes this practice was "very unlike Sonoco" supports a finding that a reasonable purchaser or seller would have viewed the total mix of information made available to be significantly altered by the disclosure of this fact. Moreover, the negative market reaction to the July 20, 2007 press conference also supports a finding at this stage of the proceedings that the price concessions were material. The record reflects that Sonoco's stock price fell by approximately 14.2% on abnormally high trading volume from the previous trading day. Additionally, the plaintiff has introduced testimony that the stock price decline on July 20, 2007 was statistically significant. (Doc. # 63–3, Decl. of John D. Finnerty, Ph.D. in Supp. of Lead Pl's Mot. for Class Cert.) In light of the foregoing, this Court concludes that the materiality requirement of the fraud-on-the-market theory has been satisfied.

(Doc. # 92).

New evidence is now available that was not available at class certification. Nevertheless, the result is the same. At class certification, this Court did not have before it the documents related to flexible packaging budgeting for 2007. As previously explained, Defendants presented this as evidence the price concessions and lost customer were factored into the earnings guidance. However, even if this information were factored into the earnings guidance, it would not render the information immaterial. The record reflects the public arguably remained unaware that Sonoco was granting price concessions. Additionally, evidence of record shows this infor-

mation was a surprise to some analysts. (Docs. # 68–9, and 71–2). The Wachovia Analyst Report noted that granting price reductions seen in flexible packaging was "very unlike Sonoco." (Doc. # 71–2). The market could consider the information regarding price concessions and the loss of an allegedly significant customer material for reasons beyond their impact on the company's ability to meet its earnings guidance. Moreover, the market's view of the impact easily could have differed from Sonoco's. Also, as noted by Plaintiff, from December 1, 2006 through December 20, 2007, Sonoco issued seven press releases announcing price increases in certain markets. Ex. F, Resp. Mot. Summ. J. (Doc. # 125–6). An unanticipated decision by the company to grant price concessions to multiple customers may be considered material by the market, especially when at least one report noted that undercutting on price was "very unlike Sonoco." The market may have believed this indicated a shift in Sonoco's bargaining power, an increase in competition, or nothing at all. Therefore, there is a genuine issue of material fact concerning the materiality of the non-disclosed information. This is a matter for the jury to decide.

Defendants seek to diminish the significance of the lost customer by pointing out that this was the loss of one customer out of thousands. Similarly, Defendants point out that Sonoco granted price concessions to three customers out of thousands, in only one division out of approximately eighteen. This evidence may be relevant to a jury's evaluation of whether the price concessions and lost customer were material. However, the Court does not find Defendants' position sufficiently persuasive to grant summary judgment in their favor. While Sonoco may have many customers, some are arguably more significant to the company's well–being than others. Accordingly, whether a reasonable purchaser would have viewed the total mix of information made available to be significantly altered by this information or important in deciding whether to trade Sonoco's stock is a question for the jury in this case.

### iii. Truths, Half–Truths, Omissions, and the Duty to Disclose

██ Plaintiff contends certain statements made by Sonoco related to higher selling prices were false or misleading. Specifically, Plaintiff argues Defendants should have disclosed the following:

(1) the Company gave price concessions to key customers, negatively impacting their expected future cash flows; (2) the price reductions led the Company to expect overall selling prices in Consumer Packaging to decline in 2007 relative to 2006; (3) overall selling prices in flexible packaging were negative compared to the prior year for the first time in at least five years; (4) the flexible packaging division lost a key customer, which would lead to lower volumes, lower profits, and cause chaos with respect to the division's productivity goals; and (5) these negative events were causing the Company's profit margins to decline, negatively impacting profitability.

Resp. Mot. Summ. J., p. 36 (Doc. # 125). Plaintiff contends these disclosures should have been made in the February 7, 2007 press release. Plaintiff also argues Defendants had several other opportunities to make these disclosures prior to the July 20, 2007 press release, when the price concessions were disclosed, but failed to do so.

Defendants argue summary judgment should be granted because these statements were unquestionably true. The April 20, 2007 press release summarized Sonoco's performance for the first quarter of 2007. Net sales were up 17% over first quarter sales of 2006. Ex. F, Mot. Summ.

J. (Doc. # 108–7). After explaining that around half the increase was the result of a longer quarter, Mr. DeLoach noted that the company was "pleased to be able to recover much of the materials and other cost increases experienced during the quarter through higher selling prices." *Id.* Then, in specific reference to consumer packaging, the company noted sales "were up year-over-year due to sales from acquisitions, higher selling prices and favorable foreign currency rates." *Id.*

Defendants contend the evidence makes clear selling prices on a company-wide basis were [Redacted] higher than they were in 2006. *See* Bridge Analysis, SON–E–00016700. Defendants argue the same document establishes that selling prices in Consumer Packaging were [Redacted] higher in the first quarter of 2007 compared to the first quarter of 2006. *Id.* This document also notes selling prices in flexible packaging were [Redacted] lower for the first quarter in 2007 compared to 2006. *Id.* Selling prices for the first quarter of 2007 in consumer packaging as a whole remained positive due to a selling price increase of [Redacted] in Rigid Paper and Plastics. *Id.*

Rule 10b–5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." 17 C.F.R. § 240.10b–5. The United States Supreme Court recently commented on the issue of disclosure, stating:

> [I]t bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when neces-

sary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading. 17 C.F.R. § 240.10b–5(b); *see also Basic [Inc. v. Levinson* ], 485 U.S. [224], at 239, n. 17, 108 S.Ct. 978[, 99 L.Ed.2d 194 (1988) ] ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5"). Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market.

*Matrixx Initiatives, Inc. v. Siracusano,* —— U.S. ——, 131 S.Ct. 1309, 1321–1322, 179 L.Ed.2d 398 (2011).

Plaintiff contends the case at hand is not one of "simply an omission of fact in the ether." [6] Hearing Tr. 129:23–24 (Doc. # 146). Rather, Plaintiff asserts the omitted facts needed to be disclosed in order to make the statements of "higher selling prices" not misleading. Plaintiff asserts the statements concerning higher selling prices are "highly misleading and therefore actionable." Resp. Mot. Summ. J. p. 34 (Doc. # 125). In support, Plaintiff asserts overall selling prices for the entire Consumer Packaging segment were [Redacted] lower in March 2007 than in March 2006. SON–E–16687. Additionally, Plaintiff asserts overall selling prices in flexible packaging were lower for the first quarter of 2007 compared to the first quarter of 2007. Thus, Plaintiff contends the affirmative statements made by Defendants regarding higher selling prices for the company and for consumer packaging required Defendants to make full disclosure of the facts to avoid making its statements misleading.

---

**6.** At the hearing, Plaintiff acknowledged that companies can control what they must disclose by controlling what they say to market and admitted that without Defendants' discus-

sion of higher selling prices, then "we'd have a tougher case here today." Hearing Tr. 131:8–14.

Plaintiff also notes that prior to and throughout the class period, Sonoco issued six press releases touting price increases in certain markets. Ex. F., Resp. Mot. Summ. J. (Doc. # 125-6).[7] These announcements noted price increases in coreboard grades, paper-based core and tube, and uncoated recycled paperboard.[8] *Id.* Each announcement gave the future effective date the price increase would go into effect. The price concessions upon which the current litigation is based were first disclosed during the July 20, 2007 press release. Ex. B, Mot. Summ. J. (Doc. # 108-3). The evidence shows the price increases went into effect January 1, 2007. Plaintiff alleges Defendants disclosed the price increases but failed to disclose the price concessions in an effort to "portray[ ] a position of great pricing power." Hearing Tr. 84:1-2 (Doc. # 146).

Finally, Plaintiff alleges analyst reports reveal the relevance of the "higher selling prices" statement and make clear the market was misled by these statements. Just after the February 7, 2007 press release, one report noted, "[w]e ... are encouraged by the Company's continued efforts to maintain pricing discipline to drive margin improvement despite short-term volume declines." Ex. G, Resp. Mot. Summ. J. (Doc. # 125-7). Another report noted, "[W]e believe a continued favorable price:cost curve should keep margins in check for 2007...." Ex. H, Resp. Mot. Summ. J. (Doc. # 125-8). Moreover, after the April 20, 2007 press release, an analyst report stated, "[O]ur view is that Sonoco continues to prove that they are solid operators, with significant pricing power across their core businesses in both the U.S. and

Europe." Ex. J, Resp. Mot. Summ. J. (Doc. # 125-10). Finally, after the disclosure of price concessions in the July 20, 2007 press release, an analyst report stated, "Most of the shortfall seems to be due to operational issues in its flexible packaging business ... in addition to some undercutting on price ... in flexible packaging (very unlike Sonoco.)" Ex. B, (Doc. # 71-2). A second report by Wachovia stated, "Specifically, flexible packaging seems to have been blindsided by operational miscues ... and some previously agreed to price concessions." Ex. C, (Doc. # 71-3).

The Court finds the arguments put forth by Plaintiff are sufficiently persuasive to deny summary judgment. It is "in light of the circumstances under which" the statements about "higher selling prices" were made that creates a genuine issue of material fact as to whether these statements were in fact misleading. *Matrixx,* 131 S.Ct. at 1321. Again, this Court makes no finding that these statements were misleading, only that an issue of fact exists. Therefore, Defendants' motion for summary judgment on this basis is denied.

**B. Scienter**

 Defendants argue summary judgment should be granted because Plaintiff has not established scienter. The Fourth Circuit has stated, "In a securities fraud action, 'the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud.' " *Ottmann v. Hanger Orthopedic Group, Inc.,* 353 F.3d 338, 343 (4th Cir.2003) (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n.

---

7. Plaintiff provided seven announcements in total. Six of the announcements come before or during the class period and before Sonoco disclosed to market the price concessions. The seventh announcement was made on December 20, 2007, after the announcement of

price concessions in flexible packaging, and after the end of the class period.

8. It is not specifically stated to which of Sonoco's segments or divisions the products belonged.

12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). Furthermore, scienter may be established by "not only intentional misconduct, but also recklessness." *Ottmann*, 353 F.3d at 344. Recklessness has been defined as "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 343, (citing *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir.1999)).

Defendants assert there is no evidence that the April 20, 2007 statement was made with intent to deceive or that the danger of misleading investors through the issuance of the statement was obvious to Defendants. Defendants contend this must be the case because the statement about higher selling prices was a true statement.

Defendants also argue Mr. DeLoach's stock sales lend no support to Plaintiff's claim. The Fourth Circuit has held, "[I]nsider trading can imply scienter only if the timing and amount of a defendant's trading were 'unusual or suspicious.'" *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 184 (4th Cir.2007) (holding that allegations the defendants artificially inflated share price to profit from personal sales fails because their sales "occurred at prices that were not especially high," no evidence was provided of the defendants' trading patterns outside the class period, and the percent share of stock sold by the defendants did not account for substantial stock options). *See also In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 390 (4th Cir.2005) (holding that where defendants' sold 1.17%, 1.47%, 1.79%, and 13% of their stock and where these defendants actually lost over $471 million in stock value during the class period, the allegations were "insufficient to raise a strong

inference of scienter"); *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 627–628 (4th Cir.2008) (holding that the sale of stock was not unusually suspicious where the defendants sold 13%, 12%, and 3% of their holdings and "the total holdings of each defendant increased while [a drug underwent an FDA study, which it ultimately failed] was ongoing").

Plaintiff asserts Defendants were specifically informed of the price concessions and the lost account prior to the start of the Class Period, spoke of higher selling prices during the class period, and did not reveal the information until the July 20, 2007 press release. Resp. Mot. Summ. J., p. 37 (Doc. # 125). Plaintiff also argues Defendants regularly received financial reports which illustrated the impact the concessions and lost customer were having on the company. *Id.* Plaintiff alleges Mr. DeLoach's stock sales were highly unusual and suspicious and indicated an intent to deceive. *Id.*

To refute Plaintiff's position, Defendants first note that Mr. Hupfer did not sell any stock during the class period. As to Mr. DeLoach, Defendants contend his stock sales were of a similar amount to his stock sales in 2006. Ex. R, Mot. Summ. J. (Doc. # 108–19). Also, Defendants note Mr. DeLoach retained 82% of his holdings during the Class Period. Ex. S, Mot. Summ. J. (Doc. # 108–20). Defendants contend further there is nothing suspicious about the timing of Mr. DeLoach's stock sales. Mr. DeLoach stated at his deposition:

> I exercised options in 2006 as well, and a good portion of my personal net worth is tied up in Sonoco .... And I've been getting constant professional advice from financial consultants to diversify my portfolio .... And I have very limited windows of when I can trade Sonoco stock ... so I had found in the past that if I started in the first quarter I would

generally get it done by year-end before [the options] expired.

DeLoach Dep. pp. 120:20–25, 121:1, 121:14–24.

Accordingly, Defendants claim the evidence is insufficient to create a triable issue as to whether Defendants acted with the intent to deceive when they issued statements concerning higher selling prices.

The Court finds the arguments put forth by Plaintiff sufficiently persuasive. As previously explained, the caselaw cited by Plaintiff makes clear a statement may be technically true, but in light of the circumstances under which it was made, the statement may be misleading. Therefore, the question is not merely whether Defendants intended to deceive the market when it issued a technically true statement, but whether Defendants recklessly mislead the market, and Plaintiff, when it made these statements while failing to disclose known information related to price concessions and the loss of an allegedly substantial customer. This is a matter for the jury to decide. This Court finds that the Defendants' omission of this information, coupled with Mr. DeLoach's stock sales, creates a genuine issue of fact on the question of scienter.

Citing to Mr. DeLoach and Mr. Hupfer's depositions, Plaintiff contends the individual defendants were aware of the [Redacted] price concessions as well as the loss of [Redacted] business prior to the start of the Class Period. See DeLoach Dep. at 152, and 43–44; Hupfer Dep. at 22–23. Additionally, Plaintiff alleges Mr. DeLoach and Mr. Hupfer received copies of the flexible packaging division's budget in November 2006 and attended the division's budget presentation during the same month. See Coker Dep. at 23. Plaintiff asserts neither Mr. DeLoach nor Mr. Hupfer disclosed this information at any press release prior to July 20, 2007.

Plaintiff asserts Sonoco's stock price was artificially inflated due to Defendants failure to disclose the price concessions and lost customer during the April 20, 2007 press release. Additionally, in the month of May, Plaintiff notes flexible packaging had an EBIT of negative [Redacted], Consumer Packaging's EBIT was almost [Redacted] below May 2006, and EBIT for the company as a whole was down [Redacted] when compared to May 2006. See SON–E–00022915. Mr. DeLoach referred to the month of May 2007 as [Redacted] SON–E–00018132. On May 14, 2007, Mr. DeLoach requested that Sonoco's manager of internal reporting provide him with information on the flexible packaging division. SON–E–000009585–000009586. Plaintiff states the report showed flexible packaging was over [Redacted] below its budgeted EBIT for the first four months of 2007. SON–E–000009586. Then, on May 18, 2007, Mr. DeLoach exercised options on 60,000 shares of Sonoco stock. Ex. M, Resp. Mot. Summ. J. (Doc. # 125–13).

On May 21, 2007, Mr. DeLoach presided over Sonoco's management committee meeting. Plaintiff cites to Mr. DeLoach's notes from that meeting where he wrote he had concerns with Consumer Packaging. He wrote, '[Redacted] SON–E–000011509. Also on May 21, 2007, Mr. DeLoach exercised options on another 95,-000 shares. Ex. N, Resp. Mot. Summ. J. (Doc. # 125–14). All options were sold between $43–43.26 per share, less than $2 per share under the highest closing price of Sonoco shares during the Class period. Plaintiff contends the timing of Mr. DeLoach's sale allowed him to "maximize the artificial inflation in the Company's common shares that resulted from the false statements issued on April 20, 2007." Resp. Mot. Summ. J., p. 21 (Doc. # 125). Plaintiff also notes Mr. DeLoach testified it was his personal decision to exercise the options and that he did not have a written

pre-defined trading plan. DeLoach Dep. at 120–126.

Based on the evidence of record, this Court holds there is a genuine issue of material fact on the element of scienter. Plaintiff has established a question of fact concerning whether Defendants were aware of the price concessions and lost customer prior to the beginning of the class period. Plaintiff has also presented evidence that Defendants received financial reports throughout the class period. Additionally, the information received by Mr. DeLoach before Mr. DeLoach exercised stock options permits an inference of scienter, as the facts at this stage must be viewed in the light most favorable to the plaintiff.

Moreover, the Court finds unavailing Defendants' argument that the inclusion of price concessions and lost customer in the earnings guidance precludes a finding of scienter. This information was not specifically disseminated to the market. Therefore, it cannot be said, reviewing the facts in the light most favorable to the plaintiff, the market was not mislead about whether or not Sonoco granted price concessions or lost a customer because the information was factored into earnings guidance calculations. Again, this is a question for the jury to decide.

## C. Loss Causation and Damages

Defendants have challenged Plaintiff's ability to prove loss causation and damages. As previously discussed, Defendants filed a motion to exclude the opinions of Plaintiff's expert on loss causation and damages. Defendants argue Plaintiff's expert should be excluded, and without expert testimony, there is no admissible evidence in the record to support the elements of loss causation and damages. As previously explained, the Court denies Defendants' motion to exclude the expert testimony of Dr. Finnerty at this stage of the proceedings. Dr. Finnerty's opinions are sufficient to create a genuine issue of material fact on the elements of loss causation and damages. Accordingly, Defendants motion for summary judgment fails on these grounds.

## CONCLUSION

For the reasons set forth herein, Defendants' motion for summary judgment is **DENIED.** (Doc. # 108). Additionally, as set forth, Defendants' motion to exclude the opinions and testimony of John D. Finnerty, Ph.D. is **DENIED.** (Doc. # 105). Plaintiff's motions to exclude the testimony of John P. Freeman and the testimony of Christopher F. Noe, Ph.D., as set forth, are **DENIED.** (Docs. # 109 and 110).

**IT IS SO ORDERED.**